JOHN GLENN AND CHARLES M. THRUSTON, APPELLANTS, *v.* THE UNITED STATES.

In 1796, when Delassus was commandant of the port of New Madrid, he exercised the powers of sub-delegate, and had authority, under the instructions of the Governor-General of Louisiana, to make conditional grants of land.

He made a grant to Clamorgan, who stipulated, upon his part, that he would introduce a colony from -Canada, for the purpose of cultivating hemp and making cordage.

This obligation he entirely failed to perform.

By the laws and ordinances of the Spanish colonial government, (which this court is bound, under the act of 1844, to adopt, as one of their rules of decision,) this condition had to be performed before Clamorgan could become possessed of a perfect title.

The difference between this case and that of Arredondo explained.

If the Spanish Governor would have refused to complete the title, this court, acting under the laws of Congress, must also decline to confirm it.

After the cession of the province of Louisiana to the United States, Clamorgan could not legally have taken any steps to fulfil his condition. He was forbidden by law. By the treaty of cession, no particular time was allowed for grantees to complete their imperfect grants. It was left to the political department of the government, and Congress accordingly acted upon the subject.

The 3d day of March, 1804, was the time fixed by Congress, and the grant must now be judged of, as it stood upon that day.

THIS was an appeal from the District Court of the United States for the State of Arkansas.

Glenn and Thruston, the appellants, filed a petition in the District Court of Arkansas, on the 24th of January, 1846, in virtue of the act of 1824, as revived by the act of 1844, claiming confirmation of a concession of a large tract of country which lies partly in Arkansas and partly in Missouri, consisting of nearly half a million of acres of land and known as the Clamorgan grant.

The circumstances of this grant are fully set forth in the opinion.

The District Court decided against the claim and the petitioners appealed to this court.

It was argued by *Mr. Webster* and *Mr. Johnson,* for the appellants, and *Mr. Crittenden,* (Attorney-General,) for the United States. The points made by the counsel respectively were the following.

For the appellants:

1st. Because if the concession was upon conditions they were conditions subsequent to the vesting of the estate in the grantee, and could only be taken advantage of by some proceeding for that purpose instituted by Spain, or by France, or by the United States claiming under Spain, and no such proceedings have been instituted. 3 Am. St. Papers, 270; 5 Id. 704.

2d. Because if the concession was upon conditions which should have been complied with in order to vest the estate as against Spain, whilst the conditions were practicable and might have been performed by the grantee, the estate vested without such performance because the province was ceded by Spain before the time for performance had expired, and because of the change of government, manners, &c., consequent on that cession. The United States *v.* Arredondo et al., 6 Pet. 706; Soulard et al. *v.* The United States, 4 Pet. 511; Delassus *v.* The United States, 9 Pet. 117.; The United States *v.* Percheman, 7 Pet. 51; Strother *v.* Lucas, 12 Pet. 410; The United States *v.* Forbes, 15 Pet. 173; The United States *v.* King, 3 How. 773; Chouteau *v.* Eckhart, 2 How. 344; The United States *v.* Lawton et al., 5 How. 10; Hughes et al. *v.* Edwards et al., 9 Wheat. 489; 2 Black. 157; 2 Thomas's Coke, 18.

3d. Because there was a sufficient survey of the grant; and

4th. Because no such survey was necessary, the calls of the grant being sufficiently certain of themselves to separate the land granted from the rest of the royal domain.

5th. That the District Court had jurisdiction over the claim. Act of 26 May, 1824, c. 173, 4 Stat. at Large, 52; act of 9 July, 1832, c. 180, 4 Stat. at Large, 565; act of 17 June, 1844, c. 95, 5 Stat. at Large, 676.

6th. That the decision of the District Court of Missouri was no bar to this suit.

*Mr. Crittenden,* for the United States.

I. That the claim is barred under both the act of 1824 and 1832.

II. That Delassus had no authority to make such a concession, and the burden of proof is on the claimants to show that he had such authority.

III. That the concession could not have been perfected into a complete title, from the political considerations mentioned.

IV. That the conditions of the concession were never performed during the sovereignty of Spain over the country, or since, and that Clamorgan ma-t be considered as having abandoned the claim.

V. That the cession of Louisiana to the United States did not make the concession absolute, without the performance of the conditions.

VI. That the survey of 1806 was void for want of authority to make it.

VII. That the concession is void for uncertainty in the description of the land intended to be conceded.

That Clamorgan lost all claim to have the concession perfected into a complete title, even if it had been in all other respects unobjectionable, by his failure to comply with the requisitions of the 23d article of Morales' regulations of 1799, to make known his incomplete title within the six months limited by that article. Read the 23d article in connection with the four preceding articles. 2 White's Recop. 240.

Mr. Justice CATRON delivered the opinion of the court.

In August, 1796, James Clamorgan petitioned Colonel Delassus, then acting as commandant of the post and dependency of New Madrid, for a grant of land fronting on the Mississippi River, for many miles, and running back to the western branches of White River, including a section of country equal in area to 536,904 arpens, as was afterwards ascertained by measurement. To obtain title and possession of this large quantity of land, Clamorgan represented, that he was a merchant residing in St. Louis; that he had been strongly encouraged by the Governor-General of the Province of Louisiana, to establish a manufactory of cordage, fit and proper for the use of his Spanish Majesty's vessels, and especially for the necessities of the Havana, to which place His Excellency desired the petitioner to export the cordage, under his, the Governor-General's protection; of which facts the commandant was advised, so that he might exercise his power to favor an enterprise likely to become very important to the prosperity of the dependency, and very lucrative to all the inhabitants of Upper Louisiana. Furthermore, that the petitioner, Clamorgan, was then connected in correspondence and interest with a powerful house in Canada, which might procure for him a sufficient number of cultivators to teach in that region

the manner of cultivating hemp, and fabricating it into various kinds of cordage, in the most perfect manner, so as thereby to respond to the views of the General Government; which desired the prosecution of this enterprise by all proper and honest means that possibly could be used, in order to exempt His Majesty from drawing in future from foreigners this article so important for the equipment of his vessels.

Clamorgan further stated, that " it is with this hope, that the petitioner has actively made the most pressing demands to obtain from his correspondents in Montreal a considerable number of people proper for this culture, who must of necessity by inducement be attracted hither, although at this moment the political circumstances of Canada appear to oppose it; but in more favorable times hereafter this object may undoubtedly be obtained. Notwithstanding which, the petitioner is obliged to assure himself, in advance, from you, Monsieur, a title which may guarantee to him the proprietorship of a quantity of arable land, proportioned to his views, in order to form an extensive establishment, as soon as the time shall appear favorable to his enterprise, and as soon as his correspondents shall be able, without compromitting their sense of duty, to cause to emigrate to this country the number of people necessary to give birth to this culture, so much desired by the government."

" Considering, Monsieur, this exposition of the petitioner, and the particular recommendations of His Excellency the Governor-General of the province, the petitioner hopes that you will be pleased to grant him the quantity of land which he desires to obtain, as well in order to favor him, the execution of all which may contribute to the future success of his project, as to furnish him the means of attracting hereafter from a foreign country an emigration of cultivators, which may not, perhaps, be obtained ntil after a considerable lapse of time, and upon promises of rewards, which the petitioner will be obliged to fulfil in their favor."

The land solicited is then described; and the petitioner proceeds to set forth the title he desires: " To the end that as soon as it may be in the power of the petitioner, he may be able to establish and select, in the tract of land so demanded, those portions which shall be best fitted to improve for the culture of hemp; because, inasmuch as a great tract of said lands is now drowned in swamps and unimprovable lowland, making it impossible to fix establishments in its whole extent; all to be done that the petitioner may enjoy the land, and dispose of it always as a property belonging to him, his heirs or assigns; and also may distribute them, or part of them, if he think fit, in favor of such person or persons as he may judge proper, to attain, as far

as on him depends, the accomplishment of his project; and the petitioner will never cease to return thanks for your favors."

To this demand of Clamorgan, the commandant responded, and proceeded to grant as follows: " Since, by the exposition contained in this petition, the means of the petitioner are apparent to me, and his new connection with the house of Todd, which will be able to facilitate to him the accomplishment of the enterprise proposed, the profit whereof, if it succeed, will redound in part to the advantage of this remote country, miserable on account of its small actual population; and I giving particular attention to the recommendations which Señor the Baron de Carondelet, Governor-General of these provinces, has communicated to me, when he thought fit to appoint me commandant of this post and its dependencies, ' to seek by all means the mode of increasing the population, and of encouraging agriculture in all its branches, and particularly the cultivation of hemp,' it appearing to me that the propositions which the petitioner makes are conducive to the attainment of this last recommendation. In virtue of this, I concede to him, for him and his heirs, the tract of land which he solicits, in the place and with the same boundaries that he prays for, provided there is injury to no one; and so that the same may be established, he shall cause a survey to be made, not obliging him to accomplish this immediately, as from the excessive extent of space, it would cause him great expense, if it were done before the arrival of the families, which he is bound to cause to come from Canada, but so that on their arrival, and being put in possession, it shall be his duty to secure his property, by means of exercising the power of survey, in order afterwards that he may make application to the Governor-General, to obtain his approval with the title in form of this his concession."

By various conveyances, the foregoing claim was vested in Glenn and Thruston, who filed their petition in the District Court of Arkansas, seeking to have it confirmed according to the act of 1844. They set forth Clamorgan's application; the commandant's decree thereon, and the mesne conveyances.

The Attorney of the United States answered, and, among other grounds of defence set up, alleged, that he was wholly uninformed as to the several statements and allegations contained in the petition; that he denied the said statements and allegations, and required full proof thereof; as well as of all other matters and things necessary or material, to establish the validity of the claim of said James Clamorgan.

On these issues the parties went to trial.

The petitioners established by proof that Clamorgan's application, and the Governor's decree thereon, were genuine; and

also proved a due execution of the several conveyances vesting title in Glenn and Thruston. No other evidence was introduced by either side. The District Court dismissed the petition; and from that decree an appeal was prosecuted to this court.

No controversy has been raised drawing in question the valid- ity of the mesne conveyances; nor do we suppose there is any difficulty in locating the land demanded in Clamorgan's peti- tion: *Primâ facie,* its locality is sufficiently described to au- thorize a survey thereof according to Spanish usages.

As regards the commandant's power to make the concession to Clamorgan there is more difficulty. In 1796, when Delassus was commandant at the post of New Madrid, he also acted as sub-delegate and exercised the faculty of granting concessions for, and ordering surveys of land. In the exercise of his func- tions he was directly subordinate to the Governor-General at New Orleans; and acted according to his instructions. Nor was he in any degree dependent on the Lieutenant-Governor of Upper Louisiana, residing at St. Louis; as appears by a let- ter of August 26, 1799, from Morales to Delassus, reciting the facts. The letter is found in document, 12 of Senate Docu- ments, 2d Session 21st Congress, p. 29, and filed as evidence by Judge Peck, preparatory to his trial before the Senate of the United States.

In a deposition of Delassus, forming part of the documents filed before the Board of Commissioners for Missouri, in 1833, and afterwards returned by them for the consideration of Con- gress, Delassus states the fact that he, as commandant at New Madrid, exercised the powers of sub-delegate. Doc. No. 59, p. 17, H. Repts. 1st Session, 24th Congress.

This commandant's powers were therefore, coextensive with those of the Lieutenant-Governor at St. Louis, in distributing the public domain. Having acted under the Governor-General, to whose orders and instructions the commandant was bound to conform, it becomes necessary to ascertain what these instruc- tions were in the present instance; and taking the facts stated in Clamorgan's memorial, and in Delassus's decree thereon, to be true, (as we are compelled to do,) it is sufficiently manifest, as we think, that the commandant did stipulate with Clamorgan, in accordance with the Governor-General's instructions. That the Governor-General had power thus to contract was held by this court, when the agreements of Maison Rouge, and Bastrop, were before it for adjudication; and having done the same through his deputy in this instance, the acts of that deputy can- not be called in question, on the assumption that he exceeded his powers.

In the document No. 59, above referred to, Delassus states

what his practice was, in giving out concessions. He kept no books in which the fact was recorded; all he did was to indorse his decree on the petition, and return it to the party demanding the land; and the party might hand it to the surveyor, or retain it at his option. That he, Delassus, believed the surveyor made a note of the concession of record; but whether before or after the survey was made, he knew not, as that matter did not concern the deponent. That no time was limited within which the party was bound to survey.

Thus it appears that Clamorgan got the paper title relied on, in the ordinary form, and which he retained in his own hands until after Upper Louisiana was delivered to the United States in March, 1804. No possession was taken of the land, or any part of it; nor was it surveyed during the time Spain governed the country; nor has any claimant under Clamorgan ever had possession, so far as this record shows.

The surveys produced to us are private ones, and of no value in support of the claim. And this brings us to a consideration of the mere title paper, standing alone. On its true meaning this controversy depends.

1. The petition of Clamorgan, and Delassus's decree on it, must be construed together; there being a proposition to do certain acts on the one side, and an acceptance on the other, limited by several restrictions.

2. What is stated in either paper as to facts, or intent, must be taken as true.

Such are the rules laid down in Boisdoré's case, 11 How. 87, and which apply here.

The country was vacant, and greatly needed population; which could only be drawn from abroad; and this population Clamorgan stipulated that he would supply, and establish a colony from Canada on the land. That he would introduce cultivators of hemp, and artisans skilled in the manufacture of cordage; and would grow hemp and make cordage, to an extent so large as to be of national consequence.

On the faith of these promises the grant was made. As already stated, no step was taken by Clamorgan to perform the contract; all that he did was a presentation of his petition, and the obtaining of Delassus's approval and decree on it. This paper he retained about thirteen years, when it was assigned to Pierre Choteau, May 2d, 1809, by a deed of conveyance for the land claimed. In view of these facts, several legal considerations arise.

It was held in Arredondo's case, 6 Peters, 711, that, by consenting to be sued, the United States had submitted to judicial action, and considered the suit as of a purely judicial character,

which the courts were bound to decide as between man and man litigating the same subject-matter; and that, in thus deciding the courts were restricted within the limits, and governed by the rules Congress had prescribed.   The principal rules applicable here, are, that in settling the question of validity of title, we are required, by the act of 1824, to proceed in conformity with the principles of justice; according to the law of nations; the stipulations of the treaty by which the country was acquired, and the proceedings under the same; the several acts of Congress in relation thereto; and the laws and ordinances of the government from which the claim is alleged to have been derived.

When deciding according to the law of nations, and the stipulations of the treaty, we are bound to hold, that such title as Clamorgan had by his concession, or first decree, stood secured to him as private property; and that the claim being assignable, the complainants represent Clamorgan.   And this brings us to the question as to what right was acquired by the concession, according to the laws and ordinances of the Spanish Colonial Government, existing and in force, when the grant was made. By these, the commandant Delassus, had authority to contract, and give concessions, and make orders of survey, by first decrees, either with or without conditions; as this court held in the case of Soulard *v.* The United States, 10 Pet. 144; provided, the concession was founded on a consideration *primâ facie* good; either past, when the concession was made, or to follow in future. Here, the consideration was to arise, by future performance, on the part of the grantee. But, it is insisted that forasmuch as a title vested in Clamorgan by the grant to him, even admitting that it was incumbered with conditions, still, as their performance was to happen subsequent to the vesting of the estate, the want of performance could only be taken advantage of by a proceeding instituted by government for that especial purpose; nor could want of performance be set up as a defence, in this suit.

If the premises assumed were true, the conclusion would necessarily follow; and Arredondo's case is relied on in support of this position, and as governing the present case.   That proceeding was founded on a perfect title, having every sanction the Spanish government could confer.   It was brought before the courts according to the 6th section of the act of May 23, 1828, which embraced perfect titles, and was only applicable to suits in Florida.

The subsequent condition there relied on to annul the grant, was rendered immaterial, and perhaps impossible, by the grantor himself, as this court held; and the grantee discharged from its performance.   But in Clamorgan's case, the conditions to occupy

22 *

and cultivate were precedent conditions; they addressed them-
selves to the Governor-General, and their performance was
required in advance. Before any right existed in Clamorgan to
apply for a complete title, or even to have a public survey, pre-
paratory to such application, he was bound by his contract to
establish his colony on the land; and furthermore, to set up his
manufactory to make cordage, and to supply it with hemp grown
on the land, unless these conditions were waived on the part of
the Spanish government. And as we are called on by the com-
plainants to adjudge the validity of this claim, and to order that
a patent shall issue for the land, in the name of the United
States, it necessarily follows, the same duty is imposed on us
that would have devolved on the Governor-General, had the
Spanish government continued in Louisiana.

By the Spanish regulations, Clamorgan was not recognized
as owner of a legal title without the further act of the King's
deputy, the Governor-General; or the Intendant-General, after
the power to make perfect grants was conferred on him. Until
this was done, the legal title remained in the crown; and the
same rule has been applied in this country; no standing can be
allowed to imperfect and unrecognized claims in the ordinary
judicial tribunals, until confirmed either by Congress directly, or
by a special tribunal constituted by Congress for that purpose.

For our opinion more at large on this subject, we refer to the
case of Menard *v.* Massey, 8 How. 305, 306, 307.

As we are asked to decree the final title, and bound to do so,
in like manner that the Spanish Governor-General or Intendant
was bound, it follows we may refuse, for the same legal reasons,
that they could refuse. And the question presented is, whether
we are bound to refuse, according to the face of the contract
sued on, and in conformity to our previous decisions in other
cases, depending on similar principles?

Very many applications made for perfect titles to the District
Courts, under the act of 1824, have been resisted, because sub-
sequent conditions had not been complied with: First, such as
mill grants in Florida, where the usual quantity of 16,000 acres
was given by concession, with a condition that the mill should
be built within a specified time: Second, where grants were
made for the purpose of cultivation, and no cultivation followed,
as in the case of Wiggins, (14 Pet.) and of Boisdoré, (11 How.):
Third, where, by the concession, parties were required by spe-
cial regulations to levee and ditch on the river's front in Lower
Louisiana. These were subsequent conditions, just as much as
the introduction of a colony of hemp-growers, and the manufac-
ture of cordage, by Clamorgan; and yet, no one has ever suc-
cessfully maintained that a party having such concession, could

Glenn et al. v. The United States.

hold the land and obtain a perfect title, although he did not build the mill, nor occupy and cultivate, nor levee and ditch, founded on the assumption that performance was unnecessary. In all these cases it was held that performance was a condition precedent and the real equity, on which a favorable decree for a patent could be founded, under the act of 1824.

If Clamorgan's concession carries with it conditions, similar in principle, it must abide by this settled rule of decision. This depends on the true meaning of his contract with the Spanish authorities. He agreed to establish a colony by introducing a foreign population, and to grow hemp and manufacture cordage, to an amount so large as to make it a national object. By these promises he obtained a concession for more than half a million of arpens of land. A promise of performance was the sole ground on which the Spanish commandant made the concession; and actual performance was to be the consideration on which a complete title could issue.

So far from complying, Clamorgan never took a single step, after the agreement was made; and in 1809 sold out his claim on speculation, for the paltry sum of fifteen hundred dollars. Under these circumstances we are called on to decide in his favor, according to the principles of justice: this being the rule prescribed to us by the act of 1824, and the Spanish regulations. To hold that an individual should have decreed to him, or to his assignees, a domain of land more than equal to seven hundred square miles, for no better reason than that he had the ingenuity to induce a Spanish commandant to grant the concession, founded on extravagant promises, not one of which was ever complied with, would shock all sense of justice. And such decision would be equally contrary to the policy pursued by Spain, which was, to make grants for the purposes of settlement and inhabitation, and not to the end of mere speculation. We so held in Boisdoré's case, (11 How. 96,) and the principle applies even more strongly in this case than it did in that; as there, something was done towards compliance; and here, nothing has been attempted.

The remaining ground on which the complainants demand a confirmation is the following: " Because if the concession was upon conditions which should have been complied with in order to vest the estate as against Spain, whilst the conditions were practicable and might have been performed by the grantee, the estate vested without such performance, because the province was ceded by Spain before the time for performance had expired, and because of the change of government, manners, &c., consequent on that cession."

That Clamorgan could take no step after the change of government, is not open to controversy.

By the 14th section of the act of March 28, 1804, which established the Territories of Orleans and Louisiana, Clamorgan was prevented from doing any further act in support of his title, had he been disposed so to do. He was positively prohibited from making settlements on the land, or making a survey of it, under the penalty of fine and imprisonment. But no advantage resulted from this provision to claimants whose concessions carried with them conditions that had not then been complied with.

The 1st section of the act of 1824, in conformity to which we are now exercising jurisdiction, limits the courts, as to the validity of title and standing of the various claims, to the condition they held before the tenth of March, 1804.

By the 3d article of the treaty of cession by which Louisiana was acquired, it was stipulated that the inhabitants of the ceded country should be admitted as soon as possible, and become citizens of the United States, and be maintained in the free enjoyment of their property in the mean time. But no time was provided by the treaty within which conditions appertaining to imperfect grants of land might be performed; this was left to the justice and discretion of our government; and in a due exercise of that discretion, the acts of 1804 and 1824 were passed; and to these acts of Congress, the 2d section of the act of 1824 commands us to conform.

The treaty addressed itself to the political department; and up to the passing of the act of 1824, that department alone had power to perfect titles, and administer equities to claimants. And when judicial cognizance was conferred on the courts of justice to determine questions of title between the government and individuals, the limits of that jurisdiction were prescribed, to wit: that no act done by the Spanish authorities, or by an individual claimant, after the 3d day of March, 1804, should have any effect on the title; but that its validity should be determined according to its condition at that date.

All claims lying within the territory acquired by the treaty of 1803, which have been brought before the courts, according to the acts of 1824 and 1844, have been compelled to abide by this test; great numbers have been rejected, because the conditions of occupation and cultivation had not been complied with before the restraining act of 1804 was passed, or before the 10th day of March, 1804. Nor have the claimants under Clamorgan more right to complain than others; his neglect extended through nearly eight years, during the existence of the Spanish government; whereas many similar claims have been rejected, where the neglect was not half so long.

If Clamorgan could come forward because of the prohibition, and be heard to excuse himself from performing the onerous

conditions his contract imposed, so could every other claimant who had neither taken possession, nor in any manner complied with his contract, do the same; and on this assumption, concessions issued by France or Spain would be without condition, and a simple grant of the land described in the paper. Its genuineness, and proof of identity of the land, would settle the question of title.

No tribunal has ever accorded any credence to this claim; two boards of commissioners have pronounced it invalid: the first in 1811, and the second in 1835. The latter on the ground that the conditions of the grant had not been complied with. By this decision it fell into the mass of public lands, according to the 3d section of the act of July 9, 1832, which declares that the lands contained in the second class (being those rejected) shall be subject to sale as other public lands. By the act of 17th June, 1844, another opportunity was afforded to apply to the District Court for a confirmation; that court agreed with the boards of commissioners, and again declared the claim invalid, because the conditions had not been complied with, and dismissed the petition; and with this decree we concur.

### Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the District of Arkansas, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged and decreed by this court, that the decree of the said District Court in this cause be, and the same is hereby, affirmed.