# INTERSTATE LAND COMPANY *v.* MAXWELL LAND GRANT COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 1267.  Argued March 10, 1891. — Decided April 6, 1891.

A demurrer admits facts well pleaded, but does not admit that the construction of a written instrument set forth in the bill is the true one, or that its legal effect is contrary to that which its language imports.

Questions affecting the validity of the Maxwell land grant, as to the authority of the Mexican government to make it, are no longer open; and a party claiming the same land under a prior grant from the Mexican government must, to succeed in his claim, recover on the strength of his own title.

An *empresario* grant of land in Mexico operated to designate a tract of country within which the *empresarios* might establish a colony or colonies; but no title to any land passed to them until such colony was established.

*United States* v. *Arredondo*, 6 Pet. 691, and *Gonzales* v. *Ross*, 120 U. S. 605, distinguished from this case.

IN EQUITY.  Decree dismissing the bill.  Complainant appealed.  The case is stated in the opinion.

*Mr. Alexander Graves* (with whom were *Mr. William Warner* and *Mr. John L. Jerome* on the brief) for appellant.

*Mr. Frank Springer* for appellee.

MR. JUSTICE LAMAR delivered the opinion of the court.

This is a suit in equity, brought by the Interstate Land Company, a Colorado corporation, against the Maxwell Land Grant Company, a corporation organized under the laws of the Kingdom of the Netherlands, and doing business in Colorado, pursuant to the laws of that State, to establish its title to a large tract of land in Las Animas County, Colorado, for which the defendant has a United States patent, and to restrain the defendant from prosecuting certain suits in ejectment against

various parties who are tenants of the plaintiff. A demurrer to the original bill was sustained by the court below presided over by Mr. Justice Brewer, then Circuit Judge, his opinion being reported in 41 Fed. Rep. 275. The plaintiff then amended its bill in some particulars, and the defendant again demurred. The demurrer was sustained, and the plaintiff declining to further amend, the bill was dismissed. From that decree an appeal was prosecuted to this court.

The case as made by the pleadings on the demurrer is as follows: The lands in dispute are part of the tract embraced in the patent to Charles Beaubien and Guadalupe Miranda, dated May 19, 1879, for what is known as the "Maxwell Land Grant," in New Mexico and Colorado, the validity of which was assailed by the United States in the *Maxwell Land Grant Case*, 121 U. S. 325, and *S. C.*, on petition for rehearing, 122 U. S. 365. In that case it was held, among other things, after elaborate argument of counsel and upon a most thorough and careful examination by the court of all the points involved, that the grant by the Republic of Mexico, in 1841, to Beaubien and Miranda, as confirmed by the act of Congress of June 21, 1860, the title of which had passed to the Maxwell Land Grant Company (the defendant in this case) by various mesne conveyances, was a valid grant; and that the survey and the patent issued upon it, as well as the original grant, were entirely free from any fraud on the part of the grantees or those claiming under them. The decision of the court in that case is not now assailed; but the contention is, substantially, that the confirmation and patenting of the grant to Beaubien and Miranda operated merely as a quit-claim of the United States to whatever rights of property the government acquired from Mexico by the treaty of Guadalupe Hidalgo, and did not, in any manner, affect claims to the same land derived from the Republic of Mexico, which antedated the original grant to Beaubien and Miranda.

The claim of the plaintiff here rests upon an alleged *empresario* grant to John Charles Beales and José Manuel Royuela, in 1832, by the government of Coahuila and Texas, then two Mexican States under one provincial administration. What-

ever rights to the lands in dispute were acquired by the original *empresarios*, or colonizing contractors, have passed to the plaintiff under various mesne conveyances.   The petition of the *empresarios* and the acceptance of their proposition by the Mexican authorities, which together constitute the basis of plaintiff's claim, are as follows:

" Petition and grants to José Manuel Royuela and John Charles Beales for the years one thousand eight hundred and thirty-two and thirty-three.

" To his excellency the governor of the State of Coahuila and Texas.

" Sir: The citizen José Manuel Royuela, a native of Saltillo, and there married, and John Charles Beales, a native of England settled in Mexico, and there married to a Mexican subject, having children, with all due respect represent to your excellency,

" That, being very desirous of augmenting the population, wealth and power of the Mexican nation, and at the same time of affording to a certain number of virtuous and industrious families the means of acquiring an honorable subsistence by cultivating a tract of land in the ancient province of Texas, and being, moreover, acquainted in full with the law of colonization passed by the honorable legislature of this State on the twenty-fourth of March, one thousand eight hundred and twenty-five, by which '*empresarios*' or colonizing contractors are allowed to undertake to colonize under the conditions and stipulations by said law prescribed, and being anxious to form an establishment that may be useful to a new colony and at the same time beneficial to the State on account of the advantages to accrue thereout,

" We pray your excellency to accept us as such ' *empresarios* ' or colonizing contractors, and to permit us to introduce into this State, within the time that may be stipulated, two hundred Catholic families, of moral and industrious habits; and for that object your excellency will be pleased to grant us the tract of land included within the following limits, viz: Begin-

ning at a landmark set up on a spot whereat the thirty-second degree of north latitude is crossed by the meridian of the hundred and second degree of longitude west from London, said spot being at the southwest corner of the grant petitioned for by Col. Reuben Ross; from thence proceeding west along the parallel of the thirty-second degree of latitude as far as the eastern boundary of New Mexico; from thence running north on the boundary line between the provinces of Coahuila and Texas and New Mexico as far as twenty leagues of the river Arkansas; from thence east to the meridian of the hundred and second degree of longitude, which is the western boundary of the grant petitioned for by said Col. Reuben Ross, and from thence proceeding south as far as the place of beginning.

"Your petitioners, as '*empresarios*,' pray for this grant on the same conditions that it was formerly given to the late Stephen Julian Wilson, whose term of six years is about to expire, on the twenty-sixth of May in this year, without the conditions of the grant having been fulfilled, in consequence of the grantee. Besides the conditions which are required by the colonization law of the State the *empresarios* and their settlers agree to observe the constitution of the Mexican nation and the private constitution of this State as well as the general and local laws that have been or shall be hereafter promulgated. They further bind themselves to comply with the conditions on which this petition is granted, and to take up arms in defence of the rights of the nation against the savage Indians or any other enemies that may attack the country or in any manner [seek] to alter its form of government or to disturb the public tranquillity; and, finally, to prevent the inhabitants of the United States of North America from trading with the said Indians and providing them with arms and ammunition in exchange for horses and mules.

"Wherefore, we pray your excellency to be pleased to grant this respectful petition, which we shall consider as a favor conferred on us.

"Dated at Saltillo, the thirteenth of March, one thousand eight hundred and thirty-two.

(Signed)

"José Manuel Royuela.
"John Charles Beales."

" *Conditions of the Grant.*

" Terms on which the supreme government of the State accepts the proposal of the citizens José Manuel Royuela and John Charles Beales for colonizing certain land with two hundred foreign families, such as are not excepted by the law of the sixth of April, one thousand eight hundred and thirty.

" ARTICLE 1. The government accepts the proposal made in the foregoing petition, as far as it is conformable with the law of colonization passed by the honorable Congress of the State on the twenty-fourth of March, one thousand eight hundred and twenty-five, and consequently assigns to the petitioners the tract of land included within the following limits, that they may establish thereon the proposed colony : It shall begin at a landmark which shall be set up on the spot where the parallel of the third-second degree of north latitude crosses the meridian of the hundred and second degree of longitude west from London, said spot being at the southwest corner of the grant petitioned for by Col. Reuben Ross. From thence it shall proceed along the parallel of the thirty-second degree of latitude as far as the eastern limit of New Mexico. From thence it shall ascend north on the boundary line between the provinces of Coahuila and Texas and New Mexico as far as twenty leagues of the river Arkansas. From thence it shall run east to the meridian of the hundred and second degree of longitude, which is the western boundary of the grant petitioned for by the said Col. Reuben Ross; and from thence it shall proceed south as far as the place of beginning.

" ART. 2. Though the boundaries of the tract set forth in the preceding clause are those assigned to Stephen Julian Wilson in a grant passed by this government on the twenty-seventh of May, one thousand eight hundred and twenty-six, yet this circumstance has not been considered an impediment to the entering into the present contract, inasmuch as the time allotted to the said Wilson for the completion of said enterprise will (expire) in the month of May of this present year without his having to this day performed the

same or any part whatsoever; but if, however, in the short time that has to elapse any number of the families of that *empresario* should present themselves, then and in that case the present grant shall, with due respect to the part or parts performed by the first grantee thereof, be null and void to all intents and purposes.

"ART. 3. In consideration of the grant hereinbefore specified the *empresarios* or contracting parties agree to introduce and settle, on their own account, two hundred foreign families, conforming themselves as well to the general law of the Republic as to the laws of the State in this behalf provided.

"ART. 4. All lands whatsoever held under legal titles that may be included within the limits designated in article first shall be respected by the colonists who shall hold under this contract, and it shall be obligatory on the part of the *empresarios* to see the observance of this clause.

"ART. 5. The State retains to itself the right of property over all the surplus lands which shall remain of this grant after laying off those which belong to the *empresarios* and their settlers according to the laws in that behalf provided.

"ART. 6. In conformity with article 8 of the law on colonization hereinbefore referred to the *empresarios* are bound to introduce the stipulated number of two hundred families within the term of six years, which shall be computed from the date hereof, under the penalty of being debarred from all the privileges and advantages afforded by the said law.

"ART. 7. It shall be obligatory on the *empresarios* not to introduce or suffer to remain in the colony men guilty of atrocious crimes or of bad conduct; as also to endeavor that no person whatsoever shall carry on traffic in arms and ammunition with the barbarous tribes of Indians in exchange for horses and mules.

"ART. 8. Whenever there shall be a sufficient number of men, the national militia shall be duly organized and regulated according to the laws of the State in that respect provided.

"ART. 9. The colony shall be regulated by the person whom this government shall appoint to allot the respective settle-

ments or possessions, and he shall duly observe the laws on colonization in force throughout the State, the general law of the eighteenth of August, one thousand eight hundred and twenty-four, and likewise the instructions to commissioners which have been appointed by the honorable Congress, taking care to afford protection within the limits of the colony to such persons only as shall be approved of by the said *empresarios.*

" ART. 10. All official communications, instruments and other public documents emanating from the colony must be written in the Spanish language.

" ART. 11. In reference to all matters not provided for or expressed in these articles, the *empresarios* or the new settlers holding under them shall abide and be governed by the federal constitution and the laws of this State.

" And his excellency the governor of the State, as also the citizens José Manuel Royuela and John Charles Beales, having agreed in the articles of this contract to grant and bound respectively to the observance and performance thereof, afterwards signed the same before me, the undersigned secretary of this government.

" And having been directed to give the *empresarios* this certified copy of all the documents relating to the grant, that they may serve them as security and as formal title (or as a title in form) thereto, the original will, according to law, remain filed and recorded in the secretary's office under my charge.

" Dated, city of Leona Vicario, the fourteenth day of March, one thousand eight hundred and thirty-two.

(Signed)          " JOSÉ MARIA DE LETONA,
                   " JOHN CHARLES BEALES.
                   " JOSÉ MANUEL ROYUELA.

" SANTIAGO DEL VALLE, *Secretary.*

" The foregoing is copied from the original documents filed and recorded in the secretary's office under my charge, whence it was ordered taken by his excellency the governor.

" City of Leona Vicario, the fourteenth of March, one thousand eight hundred and thirty-two.

(Signed)            " SANTIAGO DEL VALLE, *Secretary.*"

The bill in this case was filed January 20, 1888. After some introductory matters, it set out with much particularity the various proceedings had in the matter of the grant to Beaubien and Miranda, both under the Mexican law and subsequent to the treaty of Guadalupe Hidalgo, by which the territory was acquired by the United States, up to and including the acquisition of the grant by the defendant, substantially as they are detailed in the *Maxwell Land Grant Case*, 121 U. S. 325, and averred that that grant, being an alleged *empresario* grant, was absolutely void, because at the date it was made there was no law of Mexico in existence under which there was any authority for it. It then set out, with equal precision, the various proceedings had in relation to the alleged *empresario* grant to Beales and Royuela, and the various mesne conveyances by which the plaintiff became possessed of it. The amended bill averred that the Mexican government, by sundry and divers official acts, (which are set forth and described,) recognized that Beales and Royuela, by virtue of their *empresario* contract, had the title in fee to the lands in question. It then averred that the plaintiff and its tenants were in the exclusive possession of the premises in dispute, and that the defendant had never been in possession of them. One of the official acts of the Mexican government referred to was said to be the following order made by the President of the Republic of Mexico, dated Mexico, July 12, 1836, addressed to Beales: "His excellency the President *ad interim* has been advised of the judicious and circumspect course which you may have taken in employing your influence to allay the disturbances which have broken out and to sustain order and the obedience due to the general government, and in correcting public opinion through the medium of the newspapers in the United States of the North; and his excellency, being satisfied with this and the like proceedings on your part, which are such as belong to a good citizen, has directed me to return you thanks, as an acknowledgment for the same, and to require that you will continue in the most effectual manner in your power your good offices in defence of the just cause of the nation and to maintain and impress a

spirit of order and peace upon the inhabitants of the colonial district placed under your charge, and also upon all other persons who may be interested in the benefits which will ensue from a like course of conduct. In consideration of which services afforded to this nation in its present struggle, an order has been issued by this department, at the instance of the general-in-chief, to the army of operation to afford protection to the colonial establishments of yourself and Señor Edgerton, who has concurred in the course of proceedings which you have taken; and his excellency coöperates in the recommendation in his favor as well as yours, in the manner indicated by this communication."

The amended bill then continued as follows: "And the plaintiff further avers that the said Mexican government, in pursuance of said order, did at all times maintain and protect the possession and title of the said Royuela and Beales to the said lands, and continued so to do until the successful revolution of Texas (one of the grantors) rendered it utterly impossible to afford further protection. And the plaintiff further avers and alleges that, in addition to having taken actual possession of the lands embraced in said grant and having sectionized a large part thereof, the said Beales, in further performance of the condition of said grant, had introduced a portion of the families, as required by its terms, and would have introduced all the families of the class described therein, and would have performed all the conditions of the said grant had he not been wholly prevented in such performance by the said revolution of Texas, which resulted in its independence of Mexican authority."

Attached to the bill as exhibits, and made part of it, are copies of the records of the proceedings in the matter of both of the claims in question; and in the consideration of the questions involved herein it will be necessary to refer to some of them somewhat more in detail.

The proposition of counsel for appellant that the effect of the demurrer is an admission *pro hac vice* that the Interstate Land Company has the title in fee to the lands in dispute needs only the single reply that a demurrer admits facts well

pleaded, but does not admit that the construction of a written instrument set forth in the bill is the true one, or that its legal effect is contrary to that which its language imports. The very object of a demurrer in such case is to submit the question presented by the instrument as a matter of law for the determination of the court. Story's Eq. Pl. (9th Ed.) § 452, note *a*; *Dillon* v. *Barnard*, 21 Wall. 430, 437; *United States* v. *Ames*, 99 U. S. 35, 45.

Passing now to the merits of the controversy, the first question to be disposed of relates to the patented grant of the defendant. We have already stated that, in the *Maxwell Land Grant Case*, it was held that the grant to Beaubien and Miranda, which is the foundation of the defendant's title, was a valid grant, and that the decision of the court in that case is not directly assailed. The effect of the decision in that case, however, is evidently misunderstood by the appellant; for one of the main points urged on this appeal is, that that grant was void *ab initio*, for the reason that, being an alleged *empresario* grant, authority for it must be found in the colonization laws of Mexico, and those laws had been repealed by a law of the Republic passed in 1837, four years prior to the date of that grant. It becomes necessary, therefore, to state with some degree of particularity what was actually decided in that case.

A reference to that decision will show that the validity of the grant was one of the principal questions there considered. As stated in the opinion, the first question presented for consideration was: " Do the colonization laws of Mexico, in force at the time the grant was made to Beaubien and Miranda, namely, the decree of the Mexican Congress of August 18, 1824, and the general rules and regulations for the colonization of the territories of the Republic of Mexico of November 21, 1828, render this grant void, notwithstanding its confirmation by the Congress of the United States?" 121 U. S. 360. The court then discussed that question very fully, and came to the conclusion that the grant certainly partook very largely of the nature of an *empresario* grant, and was evidently so considered by Congress when it was confirmed. Among other

things, it was found that juridical possession had been given to the original grantees by the alcalde, one Cornelio Vigil, who accompanied the delivery of possession with a diseño or plat showing the boundaries of the tract granted. But the decision was not rested solely upon the fact that the grant was generally understood to be an *empresario* grant, but upon the proposition that the action of Congress in confirming it as made to Beaubien and Miranda, and as reported for confirmation by the suveyor general of New Mexico, without any qualification or limitation as to its extent, was conclusive upon the court. In this connection the court said, (pp. 365–6:) " But whether, as a matter of fact, this was a grant, not limited in quantity, by the Mexican decree of 1824, or whether it was a grant which in strict law would have been held by the Mexican government, if it had continued in the ownership of the property, to have been subject to that limitation, it is not necessary to decide at this time. By the treaty of Guadalupe Hidalgo, under which the United States acquired the right of property in all the public lands of that portion of New Mexico which was ceded to this country, it became its right, it had the authority, and it engaged itself by that treaty to confirm valid Mexican grants. If, therefore, the great surplus which it is claimed was conveyed by its patent to Beaubien and Miranda was the property of the United States, and Congress acting in its sovereign capacity upon the question of the validity of the grant, chose to treat it as valid for the boundaries given to it by the Mexican governor, it is not for the judicial department of this government to controvert their power to do so;" citing *Tameling* v. *United States Freehold &c. Co.,* 93 U. S. 644.

Afterwards it was said: " At the time that Congress passed upon the grant to Beaubien and Miranda, whatever interest there was in the land claimed which was not legally or equitably their property was the property of the United States; and Congress having the power to dispose of that property, and having, as we understand it, confirmed this grant, and thereby made such disposition of it, it is not easily to be perceived how the courts of the United States can set aside this

action of Congress. Certainly the power of the courts can go no further than to make a construction of what Congress intended to do by the act, which we have already considered, confirming this grant and others." 121 U. S. 382.

We conclude, therefore, that questions affecting the validity of that grant, that is, as to the authority of the Mexican government to make it, are no longer open. The action of Congress in confirming it and the subsequent proceedings in the Land Department, together with the proceedings in the courts to set aside the patent, have certainly settled those questions forever. True, those proceedings do not estop a party claiming the same land under a prior grant from the Mexican government. But, to succeed in his claim, he must recover on the strength of his own title. In other words, he must establish the validity of his own grant in order to defeat a subsequent grant which has been adjudged valid in proper legal proceedings. The confirmation and patenting of the grant to Beaubien and Miranda operated to divest the United States of all their rights to the land embraced in the grant which this country acquired from Mexico by the treaty of Guadalupe Hidalgo. And the only way that that grant can be defeated now is to show that the lands embraced in it had been previously granted by the Mexican government to some other person.

This leads naturally to the consideration of the nature and extent of the grant to Royuela and Beales in 1832, which is the foundation of the appellant's title. On the one hand it is contended that the contract of the States of Coahuila and Texas with the *empresarios* operated as a grant of the fee to the contractors of all the land described in the instruments of title, subject to be defeated only by the failure of the *empresarios* to perform the conditions subsequent of the grant; that the performance of those conditions became impossible by reason of the fact that one of the grantor States engaged in open war with the Republic of Mexico, and achieved its independence prior to the time within which such performance was required; and that the grant was thereby relieved of those conditions and became absolute. The tract thus claimed

embraces about 60,000,000 acres.  On the part of the defend-
ant it is insisted that the conditions of the grant were pre-
cedent, and that, therefore, no title passed to the contractors
until those conditions were performed; and that, in no event,
under the contract, could the *empresarios* have aquired a title
to the whole body of land described, even if all the conditions
had been performed.  In other words, it is said that the grant
in question operated simply to designate a large tract of
country within which the *empresarios* might establish a colony
or colonies; that no title to any land passed to them until
such colony was established; that if a colony was established,
the colonists were to be supplied with land taken from this
large body of land; that the amount of lands to which the
*empresarios* would be entitled, upon the establishment of a
colony, was to be determined by the number of families intro-
duced by them, and must also be taken from this large body
of land; and that, of necessity, those premium lands, of the
contractors, as they were called, must be of a less quantity
than the grant as designated by its outboundaries.

The Circuit Court adopted, substantially, the views of the
defendant.  In this we think the court was correct.  In fact,
the opinion of the learned judge who presided on the hearing
of the case, is a comprehensive and exhaustive review of the
case, as presented by the original bill and demurrer, and leaves
little to be said on the questions then presented.  A few obser-
vations, we think, will demonstrate the correctness of that
conclusion.  In construing the instruments of title, reference
must be had to all parts of them.  The mere fact that the
word "grant" is used many times in them, sometimes appar-
ently in its general and unrestricted sense of a conveyance of
the title, ought not to be permitted to outweigh other parts
of the instruments which clearly negative that idea.  Refer-
ring to the first article of the "conditions of the grant," its
language is found to be as follows: "The government accepts
the proposal made in the foregoing petition as far as it is con-
formable with the laws of colonization passed by the honor-
able Congress of the State on the twenty-fourth of March, one
thousand eight hundred and twenty-five, and consequently

assigns to the petitioners the tract of land included within the following limits, that they may establish thereon the proposed colony," etc. As was well remarked by Judge Brewer, this article "may be considered as most nearly like the granting clause in an ordinary deed." Now, does it in any sense purport to convey the fee in the lands specified to the *empresarios?* We think not. The government "assigns" to the contractors the tract of land described. But did it do so *absolutely?* Certainly not; but for a particular purpose, viz. the establishment thereon of a colony. The establishment of a colony was the consideration for the assignment. And if, as is contended, the *empresarios* thereby became possessed of the fee to that vast region of country, where were the colonists provided for? Where were they to get lands? An answer to those questions shows at once the fallacy of the appellant's position. Again, that idea is wholly inconsistent with article 5, which provides that "the State retains to itself the right of property over all the surplus lands which shall remain of this grant, after laying off those which belong to the *empresarios* and their settlers, according to the laws in that behalf provided." How could there be any *surplus* lands if the *empresarios* got all of them? That section, if it means anything at all, clearly negatives the appellant's contention, and is in complete harmony with the law of 1825 to which we shall presently refer.

But furthermore, the proposition of the petitioners was accepted, and the assignment was made "as far as it is (was) conformable with the laws of colonization passed by the honorable Congress of the State on the 24th of March, 1825." To ascertain with precision the meaning of the contract, its terms must be read in the light of that act. It is found in Rockwell's Spanish and Mexican Law, p. 641, and consists of 48 articles. The articles bearing particularly upon the question under consideration are as follows:

"ART. 8. The projects for new settlements in which one or more persons offer to bring at their expense, one hundred or more families, shall be presented to the government, and if found conformable with this law, they will be admitted; and

the government will immediately designate to the contractors, the land where they are to establish themselves, and the term of six years, within which they must present the number of families they contracted for, under the penalty of losing the rights and privileges offered in their favor, in proportion to the number of families which they fail to introduce, and the contract totally annulled if they do not bring, at least, one hundred families.

"ART. 9. Contracts made by · the contractors or undertakers, *empresarios* with families brought at their expense, are guaranteed by this law so far as they are conformable with its provisions.

"ART. 10. In the distribution of lands, a preference shall be given to the military entitled to them, by the diplomas issued by the supreme executive power, and to Mexican citizens who are not military, among whom there shall be no other distinction than that founded on their individual merit, or services performed for the country, or in equal circumstances, a residence in the place where the land may be situated; the quantity of land which may be granted is designated in the following articles.

"ART. 11. A square of land, which on one side has one league or five thousand varas, or what is the same thing, a superficie of twenty-five million varas, shall be called a ·sitio, and this shall be the unity for counting one, two or more sitios; and also the unity for counting one, two or more labors, shall be one million square varas or one thousand on each side, which shall compose a labor. The vara for this measurement shall be three geometrical feet.

"ART. 12. Taking the above unity as a basis and observing the distinction which must be made, between grazing land, or that which is proper for raising of stock, and farming land, without the facility of irrigation this law grants to the contractor or contractors, for the establishment of a new settlement, for each hundred families, which he may. introduce and establish in the State, five sitios of grazing land, and five labors at least, the one-half of which shall be without the facility of irrigation; but they can only receive this pre-

mium for eight hundred families, although a greater number should be introduced, and no fraction whatever less than one hundred shall entitle them to any premium, not even proportionally.

"ART. 13. Should any contractor or contractors in virtue of the number of families which he may have introduced, acquire in conformity with the last article, more than eleven square leagues of land, it shall nevertheless be granted, but subject to the condition of alienating the excess, within twelve years, and if it is not done, the respective political authority shall do it, by selling it at public sale, delivering the proceeds to the owners, after deducting the costs of sale.

"ART. 14. To each family comprehended in a contract, whose sole occupation is cultivation of land, one labor shall be given; should he also be a stock-raiser, grazing land shall be added to complete a sitio, and should his only occupation be raising of stock, he shall only receive a superficie of grazing land, equal to twenty-four million square bars."

The following articles of the "instructions to the commissioners appointed by the legislature of the State" for the partition of the lands among the colonists, under the act of March 24, 1825, found in Rockwell's Spanish and Mexican Law, p. 649, relate to the question at issue:

"ART. 4. He shall issue, in the name of the State, the titles for land, in conformity with the law, and put the new colonists in possession of their lands, with all legal formalities, and the previous citation of adjoining proprietors, should there be any."

"ART. 6. He shall take care that no vacant lands be left between possessions, and in order that the lines of each one may be clearly designated, he shall compel the colonists, within the term of one year, to mark their lines, and to establish fixed and permanent corners.

"ART. 7. He shall appoint under his own responsibility the surveyor, who must survey the land scientifically, requiring him previously to take an oath truly and faithfully to discharge the duties of his office.

"ART. 8. He shall form a manuscript book of paper of the

third stamp, in which shall be written the titles of the lands distributed to the colonists, specifying the names, the bounda- ries and other requisites, and legal circumstances; and a cer- tified copy of each title shall be taken from said book on paper of the second stamp, which shall be delivered to the interested person as his title."

"ART. 10. This book shall be preserved in the archives of the new colony, and an exact form of it shall be transmitted to the government, specifying the number of colonists, with their names and the quantity of land granted to each one, dis- tinguishing that which is farming land with or without the facilities of irrigation, and that which is granted as grazing land."

The act of 1825 and the instructions issued to carry it into effect, when read in connection with the terms of the "condi- tions of the grant," abundantly show, we think, that the ex- travagant claim of the appellant is utterly without foundation. In this connection we can do no better than quote the words of Mr. Justice Brewer, then Circuit Judge. After quoting from the law of 1825 and the instructions just mentioned, he said: "Article eight of the law quoted above, prescribes what the government will do when the petition of an *empresario* for colonization is presented. If found conformable with this law, the government will immediately 'designate' to the con- tractors land whereon to establish themselves. This, of course, does not mean that the government will grant them the land, but simply that it will select and designate the place where a colony may be settled. So that when we find, in the first article of the grant, that the government assigns a given tract to the petitioners for the establishment of a colony, the assign- ment is made by virtue of this article eight of the law, and means simply the selection of a place for the colony. Passing on to article 12, we find what the government will give to the *empresario* specifically declared, to wit, for each hundred fam- ilies five *sitios* of grazing land and five labors, at least the one- half of which shall be without the facility of irrigation. This article makes plain the meaning of article three of the grant, and shows that that means simply that, in consideration of

the setting apart of this large tract of land, the petitioners agree to introduce and settle on that land two hundred foreign families. Articles 12 and 13 together provide what shall be given to the *empresario* who introduces eight hundred families, and receives more than eleven square leagues of land. This last article shows a clear intent that no party should obtain title to more than eleven square leagues, no matter what services in colonization he may render to the State. Articles 14, 15 and 16 provide what the individual settlers are to receive, and sections from 12 to 16, inclusive, explain fully the meaning of article five of the grant, which declares that the State retains title to all the surplus land within the grant after laying off that which belongs to the *empresarios* and their settlers. Thus the law makes plain the meaning of the contract, and shows that it was not a conveyance passing title. In other words, the grant must be presumed to have been made in pursuance of the law, and to be limited by the terms of the law. Indeed, it is doubtful whether a grant made in excess of the authority given by the law would be valid. This grant, in terms, refers to the law under which it was made, and shows that it was made in pursuance of the authority conferred by that law, which provides that the government will select a tract of land upon which the *empresario* may establish a colony, and that, if he does, he will be paid in land at a fixed rate, and that the colonists that he introduces will also receive definite amounts of land. This grant, made thus in pursuance of this law, means just what the law says it may mean, and was simply a designation of a tract within which the petitioners might establish a colony. It of itself passed title to no portion of the land to them." 41 Fed. Rep. 281, 282.

All this is in exact harmony with what this court said in *Spencer* v. *Lapsley*, 20 How. 264, 270, 271, speaking of the colonization law now under consideration: " The contract of an *empresario* obliged him to introduce colonists into a specific district. The colonist having a family was entitled to one league of land, of a particular quality, for which he paid a small sum to the government. The *empresario* was paid five leagues and five labors for every one hundred families intro-

duced. Of course, the excess of land within the limits of the colony, after supplying the colonists and the *empresario*, remained to the government. The commissioner of distribution was an officer of the government, who superintended the fulfilment of the contract by the *empresario*. He ascertained the character of the colonists, allotted to them and the *empresario* their shares of land, and for that purpose appointed surveyors, received returns of survey, and executed the final titles. Usually this officer was not appointed until colonists were introduced, and a community was to be formed. The sale of the land within the limits of the colony might disturb the interest of the *empresario* or of the colonists, and hence reference of the contracts of sale to the commissioner for execution. If there were no colonists, and the *empresario* opposed no objection, there was no reason why sales should not be made, nor was there any occasion for the services of a commissioner." See also *Glenn* v. *United States*, 13 How. 250.

With respect to the averments of the bill that the Mexican government placed Beales in possession of the land, and recognized, in divers and sundry ways, that the fee in the land passed to him and Royuela, very little need be said. The official act of the Mexican government relied upon is set out in full, as before stated, and a reference to it shows that it does not necessarily refer to this grant. In fact, the inference is, if its very terms do not show it, that it does not. Its language is, that an order had been issued to the army of operation "to afford protection to the colonial establishments of yourself and Señor Edgerton." In view of the historical fact, noticed in *Gonzales* v. *Ross*, 120 U. S. 605, that Beales was interested in other *empresario* contracts, the above averments are, to say the least, very vague and uncertain. And the averment that Beales was put in possession of the tract is inconsistent with the Mexican colonization law, and the *empresario* contract relied upon. He could not have been put in possession of the whole region of country described, under the law of 1825; and he could not have been put in possession of any specific portion of it without first establishing a colony

of at least one hundred families. As that was confessedly not done by him, no rights of property were acquired.

With respect to the averment that, by reason of the Texas revolution, the *empresarios* were prevented from carrying out their contract, it is sufficient to say that, if such had been the case, the contractors might have perfected their claim under the laws of Texas, as passed soon after that revolution. *Houston* v. *Robertson*, 2 Texas, 1. As there is no averment of any attempt to so perfect the claim, it is difficult to see what rights can be asserted under it at this late day.

Moreover, as the claim had never been perfected prior to the treaty of Guadalupe Hidalgo, it was not protected by virtue of that treaty. It needs no citation of authorities to support the general proposition of international law that private rights of property in a ceded territory are nowise affected by a treaty cession. But that is not this case. There could be no private rights of property, no vested interest, until the conditions of the contract had been complied with. This claim was one of the class which was expressly refused to be recognized by the treaty. Article 10 of the original draft of the treaty, as agreed upon between the commissioners representing this government and Mexico, was as follows:

"ART. 10. All grants of land made by the Mexican government, or by the competent authorities in territories previously appertaining to Mexico, and remaining for the future within the limits of the United States, shall be respected as valid to the same extent that the same grants would be valid if the said territories had remained within the limits of Mexico. But the grantees of land in Texas, put in possession thereof, who, by reason of the circumstances of the country since the beginning of the troubles between Texas and the Mexican government, may have been prevented from fulfilling all the conditions of their grants, shall be under the obligation to fulfil the said conditions within the periods limited within the same respectively; such periods to be now counted from the date of the exchange of ratifications of this treaty; in default of which the said grants shall not be obligatory upon the State of Texas, in virtue of the stipulations contained in this article. The fore-

going stipulation in regard to grantees of land in Texas is extended to all grantees of land in the territories aforesaid elsewhere than in Texas, put in possession under such grants; and in default of the fulfilment of the conditions of any such grant within the new period, which, as above stipulated, begins with the day of the exchange of ratifications of this · treaty, the same shall be null and void." Message of the President of the United States, transmitting papers relative to the treaty of Guadalupe Hidalgo, Feb. 8, 1849, Ex. Doc. 50, H. R. 30th Cong., 2d Session, p. 17.

That article, however, was stricken out by the Senate of the United States, and in the message of President Polk the reasons for its rejection are stated in the following language, (Ib. 32:) "The objection to the 10th article of the original treaty was not that it protected legitimate titles, which our laws would have equally protected without it, but that it most unjustly attempted to resuscitate grants which had become mere nullities, by allowing the grantees the same period after the exchange of the ratifications of the treaty, to which they had been originally entitled after the date of their grants, for the purpose of performing the conditions on which they had been made. In submitting the treaty to the Senate, I had recommended the rejection of this article. That portion of it in regard to lands in Texas did not receive a single vote in the Senate. This information was communicated by the letter of the Secretary of State to the Minister of Foreign Affairs of Mexico, and was in possession of the Mexican government during the whole period the treaty was before the Mexican Congress, and the article itself was reprobated in that letter in the strongest terms. Besides, our commissioners to Mexico had been instructed ' that neither the President nor the Senate of the United States can ever consent to ratify any treaty containing the 10th article of the treaty of Guadalupe Hidalgo in favor of grantees of land in Texas or elsewhere.' And again, 'should the Mexican government persist in retaining this article, then all prospect of immediate peace is ended; and of this you may give them an absolute assurance.'"

It is contended, however, that the case of *United States* v.

*Arredondo*, 6 Pet. 691, governs this case in favor of the contention of the appellant. In that case, however, the grant to Arredondo was of a specific tract of four square leagues with the condition that he should establish a colony thereon. This condition was held to be a condition subsequent. It differs from this case in that here there was no grant of any specific body of land, but a mere designation of a large tract within which a colony might be formed and established; after which the land to the colonists was to be allotted, and the premium lands to the *empresarios* measured off.

Neither does the case of *Gonzales* v. *Ross*, 120 U. S. 605, control this case. They are entirely dissimilar. In that case the grant was made under and by virtue of a law of Coahuila and Texas passed in 1832, and a commissioner appointed under that law put the grantee in possession of the tract, at the same time giving him the usual *testimonio* or deed. This court held that the grant was absolute in form and sufficient to pass the title. The reasoning of the court in that case, instead of supporting the theory of the appellant, in reality is against it. In support of the general theory of this case which we have adopted, see *Fremont* v. *United States*, 17 How. 542; *United States* v. *Armijo*, 5 Wall. 444; *Miller* v. *Dale*, 92 U. S. 473; *United States* v. *McLaughlin*, 127 U. S. 428.

There are other questions presented, but the foregoing virtually disposes of them. In no aspect of the case can the appellant recover. There is no error in the decree of the court below, and it is

*Affirmed.*