No. 33,413

WILLIAM C. JACKSON, ALBERT G. BOESEL, CHARLES H. P. YALLALEE, RICHARD E. BOESEL, WILLIAM H. FLEISCHMANN and WILLIAM FLETCHER FARRELL, Partners doing business as JACKSON BROTHERS, BOESEL & Co., *Appellants,* v. THE NATIONAL BANK OF TOPEKA, *Appellee.*

(71 P. 2d 1057)

Opinion filed September 25, 1937.

*Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, Ralph W. Oman,* all of Topeka, *Walter Bachrach* and *Arthur Magid,* both of Chicago, Ill., for the appellants.

*Thomas F. Doran, Clayton E. Kline, Harry W. Colmery, M. F. Cosgrove, James E. Smith, E. H. Hatcher* and *Frank McFarland,* all of Topeka, for the appellee.

The opinion of the court was delivered by

ALLEN, J.: This was an action at law for deceit. Defendant's demurrer to plaintiffs' second amended petition was sustained by the trial court, and plaintiffs appeal.

This litigation arises out of the far-flung financial frauds and forgeries of the Finneys. The amended petition, setting up four separate counts and covering forty-nine pages, may be summarized as follows:

The plaintiffs are members of a copartnership engaged in the business of stock brokers and commission merchants, with their principal offices in New York City. Branch offices are maintained in Chicago, Ill., Kansas City, Mo., and elsewhere. The defendant, National Bank of Topeka, is a corporation engaged in the banking business in the city of Topeka.

Ronald Finney, with offices at Topeka and Emporia, was engaged in the business of buying, selling and trafficking in municipal bonds and negotiable securities. For several years prior to and until on or about the 28th day of July, 1933, he was engaged in financial transactions with defendant bank. He was a depositor of funds, and from time to time a borrower of large sums of money from defendant bank.

Warren W. Finney, the father of Ronald Finney, was president of the Fidelity State and Savings Bank of Emporia, and a director of the Farmers State Bank of Neosho Falls. He was actively engaged in buying, selling and trafficking in municipal bonds and negotiable securities, and prior to July 28, 1933, was engaged in financial transactions with the defendant bank.

The petition alleges:

"That prior to and during all the times complained of herein, the defendant bank knew that said Ronald Finney and Warren W. Finney had been for years under distrust by the banking departments, both of the United States and of the state of Kansas, and said bank lacked confidence in the honesty and integrity of said Ronald Finney and Warren W. Finney to the extent that on and after March 15, 1933, it was exerting every possible effort to cause the removal of all commercial paper, securities and bonds which said Ronald Finney and Warren W. Finney had placed in said bank in connection with their transactions with said bank, and knew that said Ronald Finney and said Warren W. Finney were not worthy of trust and confidence."

The origin and nature of plaintiffs dealings with Ronald Finney are thus stated:

"On April 27, 1933, Ronald Finney opened an account with the plaintiffs for the purpose of having plaintiffs, as brokers and agents for him, purchase, sell and otherwise deal in various commodities, stocks, bonds, and securities, and in connection with said account advance to him and for his account large sums of money; that said Ronald Finney thereafter carried on large and numerous transactions with plaintiffs in his said account with them, and in connection with such dealings and as an incident thereto, Ronald Finney borrowed from the plaintiffs, and the plaintiffs advanced to Ronald Finney and for his account, large sums of money from time to time, and on account of his transactions with the plaintiffs Ronald Finney became indebted to plaintiffs in large sums of money upon an open and general account; that for the purpose of securing said account and indebtedness and to procure credit and the advancement from time to time of moneys from plaintiffs, and to induce the extension of credits thereon and procure without delay the advancement of moneys upon said account, Ronald Finney did from time to time deliver to and deposit with plaintiffs various instruments purporting to be the bonds or obligations of various municipal subdivisions of the state of Kansas, negotiable by delivery, which instruments are hereinafter described, and the plaintiffs advanced various sums of money, as hereinafter stated, upon the purported bonds delivered by said Ronald Finney as security therefor."

It appears that the account of plaintiff with Ronald Finney began on April 27, 1933, and ended on July 27, 1933. The following statement shows the bonds delivered by Ronald Finney to the plaintiffs, and the advances made to Finney, and sets forth the respective dates of such transactions:

| Advances to Finney | | Bonds Received from Finney | |
|---|---|---|---|
| May 29 | $25,000.00 | May 29 | $30,000.00 |
| May 29 | 5,000.00 | | |
| June 2 | 10,000.00 | | |
| June 6 | 10,000.00 | | |
| June 9 | 261.48 | | |
| June 12 | 10,000.00 | | |
| June 28 | 11,000.00 | | |
| June 29 | 10,000.00 | | |
| July 5 | 3,500.00 | | |
| July 7 | 12,000.00 | July 7 | 35,000.00 |
| July 7 | 25,000.00 | | |
| July 11 | 30,000.00 | July 11 | 60,000.00 |
| July 17 | 7,000.00 | | |
| July 17 | 9,000.00 | | |
| July 20 | 5,000.00 | | |
| July 21 | 30,000.00 | July 21 | 276,200.00 |
| July 22 | 15,000.00 | | |
| July 22 | 85,000.00 | | |
| July 27 | 50,000.00 | | |

It is alleged that all of the bonds delivered by Ronald Finney to the plaintiffs were forged, spurious and counterfeit, except certain bonds of the face value of $48,700, which were genuine.

The controversy involves four separate blocks of bonds—one block of $30,000; one block of $151,600; one block of $208,500 and one block of $25,000. All of the bonds here in question deposited with the plaintiffs were delivered to the plaintiffs by Ronald Finney except the block of bonds of the face value of $25,000, which were delivered by Ronald Finney to the defendant bank; and thereafter on July 7, 1933, upon the direction of Ronald Finney, these bonds were delivered to the plaintiffs by the defendant bank. The legal questions arising on this block of $25,000 of bonds are entirely separate and distinct from the legal questions concerning the three blocks of bonds first noted. Bearing in mind this distinction, the allegations in the petition concerning the first three blocks of bonds will be stated, and thereafter the alleged cause of action as to the block of bonds of the face value of $25,000 will be considered.

In the first block of bonds of $30,000 delivered to the plaintiffs, one bond of $1,000 is conceded to be genuine. As to the other bonds in that block, aggregating $29,000, it was alleged that prior to May 29, 1933, the defendant bank was the owner and in possession of certain bonds of the purported face value of $29,000; that the bonds were forged, spurious and counterfeit and of no value whatsoever—all of which the Finneys knew and all of which the defendant bank then and there well knew.

It was further alleged:

"That prior to May 29, 1933, National Bank of Topeka sold and delivered said purported bonds to Warren W. Finney and Ronald Finney; that at the time of said sale and delivery of the said purported bonds, Warren W. Finney and Ronald Finney intended and planned, and the National Bank of Topeka knew that they intended and planned, to deliver, transfer and negotiate said forged, spurious and counterfeit bonds to innocent purchasers for value, and to place said forged, spurious and counterfeit bonds into the channels of commerce, and to obtain money from such persons as would lend or advance money on the supposed security of said purported bonds in the belief that they were genuine and valid, by falsely and fraudulently representing to them that they were genuine and valid legal obligations of the respective municipal subdivisions of the state of Kansas by which on their face they were purported to have been issued, and by concealing from such intended innocent purchasers for value the fact that all of said purported bonds were forged, spurious and counterfeit, and of no value whatsoever.

"That on or about May 29, 1933, said Ronald Finney delivered to the plaintiffs said purported bonds of the purported face value of $29,000; that

for the purpose of inducing the plaintiffs to advance money to and for the account of said Ronald Finney on the supposed security of said purported bonds of the purported face value of $29,000, said Ronald Finney then and there, orally and by offer and delivery thereof, falsely and fraudulently represented to the plaintiffs that said purported bonds had been issued by, and evidenced valid and subsisting legal obligations of, the city of Kansas City, Kan.; that together with said purported bonds of the purported face value of $29,000, said Ronald Finney at the same time delivered to the plaintiffs a certain treasury certificate for $1,000, . . . which, so far as plaintiffs know, evidences an authentic and genuine obligation of the government of the United States and was accepted by plaintiffs as such."

As to the block of bonds of the face value of $151,600, it was alleged that on or about June 30, 1933, the defendant bank was the owner and in possession of certain purported bonds of a purported face value of $151,600, and purporting on their face to have been issued by, and to evidence valid and subsisting legal obligations of various municipal subdivisions of the state of Kansas; that in this block of bonds certain bonds of the purported face value of $90,000 were forged, spurious and counterfeit. This was followed by recitals similar to the allegations as to the block of bonds of $29,000, above set forth.

As to the third group of bonds above mentioned of the purported face value of $208,500, it was alleged that the defendant bank, prior to July 11, 1933, was the owner and in possession of these bonds, that they were forged, spurious and counterfeit. This was followed by recitals similar to the allegations as to the block of bonds of $29,000, above set forth.

Coming now to the block of bonds of the face value of $25,000, which were delivered to the defendant bank by Ronald Finney and which were by the bank, under the direction of Ronald Finney, delivered to the plaintiffs, the petition alleges:

"That on or about May 17, 1933, National Bank of Topeka, with the knowledge, consent and at the direction of Ronald Finney, sent to the plaintiffs at their branch office at Kansas City, Mo., a letter .in words and figures as follows:

" 'This will advise that Mr. Ronald T. Finney has left with us $25,000 par value Kansas municipal bonds represented by $20,000 Kansas City, Kan., and $5,000 Stevens county, Center township. These bonds have been left with us to be later placed in joint account as collateral on future trading which he may have with your good company.

" 'No doubt you have a special form of interim receipt which you desire used and we will appreciate it if you will send us the form you wish used in this transaction. In the meantime, we will hold the bonds subject to confirmation in accordance with yours and Mr. Finney's instructions.'

"That on or about July 7, 1933, National Bank of Topeka, with the knowl-

edge, consent and at the request of Ronald Finney, delivered to plaintiffs certain purported bonds of the purported face value of $25,000, and purporting on their face to have been issued by, and to evidence valid and subsisting legal obligations of, the municipal subdivisions of the state of Kansas, and in the amounts, as described in the following receipt which the National Bank of Topeka then and there took from the plaintiffs therefor, which said receipt is in words and figures as follows:

" 'Received of the National Bank of Topeka the following bonds left with you by Ronald Finney for our account':

(Bonds here listed)

. . . . . . . . . . . .

"That none of said purported bonds had ever in fact been issued by, or evidenced any valid or subsisting legal obligation of the respective municipal subdivision of the state of Kansas by which on its face it was purported to have been issued, but that all of them were forged, spurious and counterfeit, and of no value whatsoever; all of which Ronald Finney then and there well knew, and all of which the bank then and there well knew.

"That at the time of said delivery of said purported bonds, Ronald Finney intended and planned, and National Bank of Topeka knew that he intended and planned, to obtain money from the plaintiffs on the supposed security of said purported bonds in the belief that they were genuine and valid, by falsely and fraudulently representing to plaintiffs that they were genuine and valid legal obligations of the respective municipal subdivisions of the state of Kansas by which on their face they were purported to have been issued, and by concealing from plaintiffs the fact that all of said purported bonds were forged, spurious and counterfeit, and of no value whatsoever.

"That for the purpose of inducing the plaintiffs to advance money to and for the account of Ronald Finney on the supposed security of the said purported bonds of the purported face value of $25,000, the defendant bank and Ronald Finney then and there falsely and fraudulently represented to the plaintiffs by means of the aforesaid letter, dated May 17, 1933, and by means of a certain letter, dated June 16, 1933, sent by the defendant bank, with the knowledge, consent and at the request of Ronald Finney, to the plaintiffs and by the plaintiffs received, which letter is in words and figures as follows:

" 'This will advise that we hold the following bonds which have been deposited with us by Ronald Finney for your account':

(Bonds here listed)

" 'As before stated, the foregoing bonds have been deposited with us by Ronald Finney to secure his account with you and are left with us subject to your order. We understand from your manager, Mr. Stebbings, of your Kansas City office, that you have a certain interim certificate which you ordinarily use in cases of this kind. If you have such an instrument and will forward same to us we will endeavor to have it properly executed.'

and by means of the delivery to plaintiffs of said purported bonds of the purported face value of $25,000, that said purported bonds had been issued by, and evidenced valid and subsisting legal obligations of, the respective municipal subdivisions of the state of Kansas by which on their face they were purported to have been issued."

It was also alleged in the petition that in October, 1932, defendant held certain instruments purporting to be certain warrants issued by a school district located in the town of Green, Clay county, Kansas, which defendant had previously received from Ronald Finney as securities for advances made to him; that defendant discovered in October, 1932, that the entire issue, of which the warrants held by it purported to be a part, had been called in, paid and destroyed by the issuing school district; that defendant requested Ronald Finney to redeem the warrants and pay defendant the money advanced on the security of such warrants, which was done.

The second count is identical with the first count except that here the Finneys are alleged to have been trafficking in "purported" bonds instead of "forged" bonds. It is set forth in the brief for plaintiffs that—

"The only material difference between count first and count second is that the latter does not allege that when the defendant sold and delivered the forged bonds to the Finneys, they intended and planned, to the defendants' knowledge, to obtain money on the supposed security of said forged bonds from innocent persons for value."

The third count sets out the letters of May 17, 1933, and June 16, 1933, above quoted, in which defendant advised plaintiffs that Ronald Finney had deposited bonds of the face value of $25,000 with defendants to be held subject to directions of the plaintiffs and Ronald Finney, sets up the same allegations as in the first count, and further alleges that these letters created a relationship of trust or agency between defendants and plaintiffs; that defendant knew said bonds were forged, and owed the plaintiffs a duty to notify them of all matters within their knowledge; that defendant violated that duty by nondisclosure.

The fourth count is thus summarized in plaintiffs' brief:

"Count fourth is in all respects the same as count first except that count fourth alleges additionally that all the acts and transactions therein set forth were in furtherance of a conspiracy to which the defendant, the two Finneys, and one Thomas B. Boyd, then state treasurer of the state of Kansas, were parties, and which was entered into for the purpose of uttering, delivering, transferring and negotiating forged Kansas municipal bonds to innocent purchasers for value, to place them into the channels of commerce, and to obtain money from innocent persons who would lend money on the supposed security of these forged bonds in good faith reliance upon their apparent genuineness. Count fourth also sets forth additional facts relative to the purported bonds of a purported face value of $151,600 (among which were $90,000 purported face value of forged Kansas municipal bonds), showing that the defendant,

the Finneys and Boyd also defrauded the state of Kansas of $150,000, of which the defendant directly benefited to the extent of $146,172.71.

"In essence, therefore, count fourth alleges that the defendant, the two Finneys and Boyd entered into a conspiracy to place forged Kansas municipal bonds in circulation, and obtain money from innocent purchasers for value on the supposed security of said forged bonds; that the conspiracy was carried out, and that among the innocent victims of said conspiracy were the plaintiffs who, in good faith reliance upon the apparent genuineness of the forged bonds, parted with large sums of money and suffered a net loss of $236,895.87."

Defendant filed motions to strike and to make definite and certain, which were overruled. Defendant filed a demurrer to plaintiffs' petition, asserting want of legal capacity in the plaintiffs to sue, improper joinder of several causes of action and failure of the petition to state facts sufficient to constitute a cause of action. The trial court sustained the demurrer, and the only question presented is the legal sufficiency of the petition.

Defendants assert: It is not claimed in the petition that plaintiffs ever made any inquiries of the defendant in regard to Ronald Finney, that any of the bonds were purchased from the defendant by the plaintiffs in reliance upon any representations, express or implied, made by defendant to the plaintiffs; that on July 7, 1933, plantiffs had actual notice of the forgery of the bonds because the petition shows that on that date plaintiffs received from Ronald Finney a certain bond, and at that time plaintiffs had in their possession a bond of the identical description, which they had received from Ronald Finney on May 29, 1933. That it is not alleged in the petition that defendant had any actual knowledge that any of the bonds received by plaintiffs from Finney were forged; that on the other hand, with the exception of the block of bonds of $30,000 received by plaintiffs on May 29, 1933, all of the bonds received from Finney were received by plaintiffs after they had in their possession positive information, by reason of said duplicate bond received on July 7, 1933, that Ronald Finney was trafficking in forged bonds; that it is not charged that defendant had any knowledge on May 29, 1933, that Ronald Finney on that date had sold plaintiffs bonds of the face value of $30,000, nor is it alleged that at the time plaintiffs purchased said bonds they had any knowledge whatsoever that said bonds had ever been owned by the defendant, or that plaintiffs had ever relied upon any representations, either express or implied, made by the defendants. That on July 7, 1933, as shown by the account above set forth, the plaintiffs had advanced

to Ronald Finney a total of $121,761.48 and had up to that time received from Finney only $30,000 face value of bonds; that on July 20, 1933, as shown by said account, plaintiffs had advanced to Finney $171,761.48, and that the total amount of bonds received from Finney to that date amounted to $125,000. That on July 21, 1933, the advances made by plaintiffs to Ronald Finney exceeded the face value of bonds received from him by $47,761.48, and it was only after a block of bonds had been received from Finney on that date that the bonds received from Finney exceeded the advances made to him. That these facts demonstrate that plaintiffs made their investments on their independent investigations and not in reliance upon any representations, express or implied, made by defendant. Defendant further asserts that no facts or circumstances are alleged that would show defendant knew that said bonds were forged; that the plaintiffs, as shown by the petition, were bond brokers and were far more skilled in matters pertaining to municipal bonds than were the defendants. Defendant also insists that as to the block of bonds of $25,000 deposited by Finney with the defendant bank and referred to in the letters above quoted, the defendant was not a trustee or agent of the plaintiff, but merely acted as a gratuitous bailee, and therefore owed no duty to plaintiffs as alleged in plaintiffs' petition.

The plaintiffs contend that the recitals on the face of the forged bonds constituted false representations because they showed such purported bonds to be genuine, whereas the contrary was true. That by selling and delivering these forged bonds to the Finneys, the defendant bank caused these false representations to be placed in circulation, in the course of which such false representations reached the plaintiffs and caused them damage; that such representations must be deemed to have been made by the defendant to any person who in good faith became the holder for value of such bonds. Plaintiffs rely on *Lobdell v. Baker,* 1 Met. (Mass.) 193; 3 Met. (Mass.) 469; *Polhill v. Walter,* 3 B. & Ad. (Eng.) 114; *Shotwell v. Mali,* 38 Barb. (N. Y.) 445; *Windram v. French,* 151 Mass. 547, 24 N. E. 914; *Bank v. Byers,* 139 Mo. 627, 41 S. W. 325, and other cases of like import in support of their contentions.

We think the petition stated a cause of action for deceit, and that the lower court committed error in sustaining the demurrer to plaintiffs' petition.

In *State, ex rel., v. National Bank of Topeka,* 142 Kan. 792, 52 P.

2d 1199, this court had under consideration the sufficiency of a petition involving the Finney frauds. It was there said:

"With the foregoing question out of the way, defendant's contention that the amended petition did not state a cause of action should not be difficult of solution. Bearing in mind that for the purpose of testing the sufficiency of the amended petition every material fact alleged and every reasonable inference justified thereby are to be construed favorably to the pleader, just what can be said to be wanting to a sufficient statement of the state's cause of action? The state alleges that through the alleged maneuvers of defendant and the state treasurer and W. W. Finney it has lost $150,000. It alleges that the various alleged steps by which that loss was caused were knowingly participated in by the defendant. It takes nothing from the materiality and gravity of these allegations for the defendant at this time to argue that so far as the defendant bank was concerned the transaction had the prima facie semblance of regularity. When this case is tried to a jury that argument may serve the defendant to good purpose. But for the purposes of this appeal, the defendant bank admits the truth of all the material allegations of plaintiffs' petition. Therefore, it would be a travesty on justice for this court to hold that it does not state a cause of action. It is needless in this opinion to stress the outstanding features of the petition which compel this conclusion." (p. 795.)

, The petition alleges that the defendant bank sold forged bonds to the Finneys, knowing that the bonds were forged and knowing that the Finneys planned to dispose of them to innocent purchasers for value. These bonds are shown by the allegations to have purported on their face to be genuine and valid obligations of certain municipal subdivisions of the state of Kansas. The recitals on the face of the bonds constituted false representations, because they showed such purported bonds to be genuine on their face, whereas the exact contrary was true. By selling and delivering these forged bonds to the Finneys, the defendant bank caused the false representations to be placed in circulation. The forged bonds of apparent genuineness were payable to bearer on their face, and were designed to pass freely from hand to hand by mere delivery. Knowing that they were forged and that the recital therein was false, the defendant, by giving currency to such false statements, is liable for damages to any bona fide purchaser of these forged bonds.

The sufficiency of the allegations in an action for fraud and deceit has frequently been passed on by this court. (*Meyer v. Wilson,* 131 Kan. 717, 293 Pac. 738; *Youmans v. Kansas Tel. Co.,* 132 Kan. 360, 295 Pac. 697; *Campbell v. Gooch,* 131 Kan. 456, 292 Pac. 752; *Bolinger v. Giles,* 118 Kan. 761, 236 Pac. 658; *Curtis v. Stilson,* 38

Kan. 302, 16 Pac. 678; *North Am. Life Ins. Co. v. Dyatt*, 121 Kan. 873, 250 Pac. 341; *Sluss v. Brown-Crummer Inv. Co.*, 143 Kan. 14, 53 P. 2d 900; *Blankinship v. Porter*, 142 Kan. 284, 47 P. 2d 72.)

The petition alleges "That for the purpose of inducing the plaintiffs to advance money to and for the account of Ronald Finney on the supposed security of the said purported bonds of the purported face value of $25,000, the defendant bank and Ronald Finney then and there falsely and fraudulently represented to the plaintiffs by means of the aforesaid letter dated May 17, 1933, and by means of a certain letter dated June 16, 1933, . . . and by means of the delivery to plaintiffs of said purported bonds of the purported face value of $25,000, that said purported bonds had been issued by, and evidenced valid and subsisting legal obligations of the respective municipal subdivisions of the state of Kansas."

Here is a direct allegation that the defendant bank, by the letters quoted and by the delivery of the bonds, fraudulently represented to the plaintiffs that the bonds were genuine, when in fact they were forged. Under the rule often announced by this court that in testing the sufficiency of a petition as against a demurrer every material fact well pleaded, and every reasonable inference therefrom, are to be construed favorably to the pleader, we think the petition stated a cause of action and that the trial court erred in sustaining the demurrer to the petition. The judgment is reversed.

ALLEN, J. (dissenting): I think the demurrer to the petition was properly sustained.

As stated in the opinion of the court, the controversy concerns four separate blocks of bonds. Three blocks of these bonds are alleged to have been delivered by the defendant bank to the Finneys, and by Ronald Finney delivered to the plaintiffs; one block (of $25,000) is charged to have been delivered by Ronald Finney to the defendant bank, and then at the direction of Ronald Finney, delivered to plaintiffs by the defendant bank.

As to the three blocks of bonds first mentioned, the petition alleges: That the defendant bank was the owner and in possession of certain bonds, that the bonds were forged, spurious and counterfeit and of no value whatsoever, all of which the Finneys knew and the defendant bank then and there well knew. It is then alleged that the defendant bank sold and delivered these bonds to the Finneys.

As the plaintiffs' cause of action on these transactions hinges on this statement, it becomes important to determine the legal relationship existing between the Finneys and the defendant bank. If the bank owned the bonds, they were acquired either from the Finneys or from third persons. It is not alleged they were acquired from third persons. To assert the defendant bank acquired the bonds from third persons for value and that the bank then sold the bonds to the Finneys, when the Finneys knew the bonds were forged, is a hypothesis too extravagant to entertain. This theory must be dismissed.

The petition must be construed as a whole. So construed, it appears on the face of the petition that the bonds held by defendant bank were acquired from the Finneys. The petition alleges that "said bank lacked confidence in the honesty and integrity of Ronald Finney and Warren W. Finney to the extent that on and after March 15, 1933, it was exerting every possible effort to cause the removal of all commercial paper, securities and bonds which said Ronald Finney and Warren W. Finney had placed in said bank in connection with their transactions with said bank." Also, in plaintiffs' brief it is stated: "Defendant knew that the two Finneys were not worthy of trust and confidence, and it lacked confidence in their honesty and integrity to such an extent that on and after March 15, 1933, it was exerting every effort to clear its portfolio of all bonds, securities and commercial paper which had been placed with it by them in connection with their transactions with the defendant."

The securities that the Finneys "had placed in said bank in connection with their transactions with said bank" were either purchased by the bank from the Finneys or were deposited with the bank as collateral security for money loaned by the defendant bank to the Finneys. In either event the defendant bank, upon ascertaining that the bonds were forged, had a lawful right to return such securities to the Finneys upon payment of the amount due the defendant bank.

If the defendant bank purchased the bonds outright from the Finneys or upon a repurchase agreement they were purchased as valid and genuine bonds. If the bonds so sold to the bank were forged, then the bank had a lawful right to rescind the sale for fraud. (*King v. Machine Co.*, 81 Kan. 809, 106 Pac. 1071; *Murray v. Davies*, 77 Kan. 767, 94 Pac. 283; *Dutton v. Dutton*, 113 Kan. 146, 213 Pac. 326.)

A rescission of a contract demands as a general rule the restoration of the *status quo* of the parties. In order to rescind a contract for fraud, the defrauded party must restore or offer to restore the consideration received under the contract. (*Basye v. Refining Co.*, 79 Kan. 755, 101 Pac. 658; *Bell v. Keepers*, 39 Kan. 105, 17 Pac. 785; *Dutton v. Dutton*, 113 Kan. 146, 213 Pac. 326; *Wicks v. Smith*, 21 Kan. 412.)

If the transaction by which the bonds were acquired by the defendant bank from the Finneys was a purchase, then it is clear from the petition that the transfer of the bonds from the defendant bank to the Finneys was not a sale, but a return of the bonds upon a mutual rescission. Upon receiving payment for the bonds it was not only the right but the duty of the defendant bank to return the bonds to the Finneys.

The allegation in the petition that the defendant bank owned the bonds, knew they were forged, then sold the bonds to the Finneys, who also knew they were forged, is flatly absurd. A demurrer does not admit allegations that are manifestly untrue, nor allegations that are contrary to all commercial experience. Sane people do not buy forged bonds knowing the bonds are forged. Therefore, the only rational construction of the petition is that the bonds were received by the bank from the Finneys and upon payment were returned to the Finneys. Thus the proposition is narrowed to the question as to whether the delivery of the bonds to the Finneys under the circumstances was lawful.

On this point the case of *Cotten v. Halverson*, 201 Ia. 636, 207 N. W. 795, is worthy of careful study. The facts in that case more nearly approach the facts in the case at bar than any other which our research has disclosed.

In that case it appears that one Cotten was the owner and holder of certain promissory notes aggregating $10,000 which were secured by mortgages. Certain of these notes and mortgages purported on their face to have been executed by one Christensen. These notes were purchased by Cotten from one Halverson. When Cotten attempted to negotiate the notes he learned certain facts which led him to believe that the notes and mortgages might not be genuine. Further investigation disclosed that Christensen was not the owner of the land covered by the mortgages; that the abstracts accompanying the loan were false, and that the entry of recording on the back of each mortgage was false. Thereupon Cotten approached

Halverson, called his attention to these matters, and requested him to take up the notes and mortgages. In settlement Halverson paid Cotten $4,900 in cash and executed a mortgage and note for the balance, $5,778.50. It was conceded by all parties that the notes formerly held by Cotten which were turned over to Halverson, together with the mortgages accompanying the notes, were all forgeries. It was contended there was no consideration for the new mortgage given by Halverson to Cotten; that Cotten in taking the mortgage was compounding a felony under the statute. (The Iowa statute quoted was almost identical with our statute, G. S. 1935, 21-714.) The question then squarely arose as to whether Cotten, who had purchased the forged securities, had a right upon mutual rescission to turn the forged securities back to the forger. The court said:

"We have searched the record in vain for any other testimony which would in any way support the appellants' contention herein. It is true that Cotten was probably satisfied in his own mind that the mortgages and notes bought by him from Halverson were forgeries, but this would not prevent him, in good faith, from collecting the same from Halverson if he could. The evidence shows that he did not proclaim the forgeries from the housetops, and why need he? He was limited and required by the statute not to make any agreement or understanding with Halverson to conceal these matters. He was not to make any agreement or understanding that he would not prosecute or testify. This is the limit placed upon him by law. He seems to have obeyed the letter of the law, and since he has so done, we see no reason why he should be penalized by declaring his mortgage and note void. It is true that the record shows that, after the making of this mortgage and note, Halverson pursued his nefarious practice, and sold numerous other forged mortgages and notes to other parties; but we are unable to see how this has any bearing on the question as to whether or not a prohibited agreement or understanding existed between Cotten and Halverson at the time of the making of the note and mortgage in suit. The appellants failed to sustain the burden of proof on them, and therefore the ruling of the district court was right." (p. 641.)

If, on the other hand, the bonds were deposited with the bank by the Finneys as collateral security for money loaned to the Finneys, then upon payment of the debt it was not only the right, but the duty of the defendant bank to return the collateral to the Finneys.

This question came before the supreme court of Iowa in the case of *Deere & Co. v. Wolff et al.*, 65 Ia. 32, 21 N. W. 168. One Wolff had transferred to the intervenor bank certain notes as collateral security for a debt he owed the bank. These notes were forgeries. The bank having ascertained that the collateral notes were forgeries,

secured from Wolff, to secure his indebtedness to the bank, mortgages on certain property. Subsequently Wolff transferred the property to the bank in satisfaction of the debt. Creditors of Wolff attached the property, and the question presented was whether the bank receiving payment of its debt could lawfully return the forged paper to the forger. The court said:

"Surely a party holding in good faith forged paper (and it is not claimed that the bank did not so hold the paper in question) may accept payment in money, or receive payment in property, from the guilty party, who is bound upon the paper for the payment thereof. It cannot be that the holder must lose his debt, for the reason that the law forbids him to receive payment. This proposition will not admit of argument. Upon receiving payment of paper, the law requires the holder to deliver it to the person paying it. Now, if he may accept payment from the forger, he may surrender the paper to that person. The surrender of the paper would, in the language of the instruction, 'enable' the forger 'to destroy or suppress' the paper. The holder may intend to place the paper in the hands of the forger, and thus *intend* 'to enable him to destroy or suppress it,' without an unlawful purpose. The delivery of the paper is lawful; but it gives the forger an opportunity to destroy it, and he is *enabled,* by the delivery, to do so. The holder, therefore, could not deliver the paper without the purpose of enabling, thereby, the guilty party to destroy or suppress it. But, as we have seen, the delivery of the paper was a lawful act. The instructions do not contemplate that it was done with the intent to procure, induce or cause the destruction of the paper, which doubtless would be unlawful. It is a very different thing to induce or cause an act, and to give an opportunity to do it. One may innocently and lawfully do an act, when inducing or causing it would be unlawful. The instructions erroneously express the thought that the destruction or suppression of the notes would amount to a destruction or suppression of the evidence of the forgery. It is true that it would amount to the destruction or suppression of an instrument which, if in existence and not in the hands of the accused, must be produced at the trial upon an indictment for the offense. But, if destroyed or withheld by the accused, secondary evidence of its contents may be introduced." (p. 37.)

Plaintiffs refer to the case of *State, ex rel., v. National Bank of Topeka,* 142 Kan. 792, 52 P. 2d 1199. In the pleadings in that case it is set out that the bonds in question—and they were the same bonds here in question—were delivered to the defendant bank upon a repurchase agreement as security for borrowed money. Hence the allegation in the petition that the defendant bank "was the owner and in possession" of the bonds in question, when read in the light of the other allegations in the petition, means no more than that the bonds were in the possession of defendant as security for borrowed money, and the allegation that the bonds were sold by

the defendant bank to the Finneys must be construed to mean that the bonds so pledged to the bank were delivered to the pledgor upon payment. If the defendant had cause to doubt the validity of the collateral in its hands, it would seem clear it had a moral and legal right to return the bonds to the Finneys upon payment of the debt due the bank. It is clear no cause of action is stated as to these bonds.

Next, consider the situation as to the block of bonds of the purported face value of $25,000, which the petition alleges that Ronald Finney delivered to the defendant bank and which were delivered by defendant bank to the plaintiffs. The petition sets out two letters from the defendant bank to the plaintiffs—one dated May 17, 1933, and one dated June 16, 1933—in which the defendant bank advised plaintiffs that Ronald Finney had left the bonds with defendant for the account of plaintiffs, and requesting directions as to the disposition of the bonds. All of the third count in the petition and a large part of the first count pertains to this transaction and consists of allegations as to the meaning, construction and legal effect of these letters. It is alleged that by means of these letters the defendant bank made false representations to the plaintiffs, and it is upon this direct allegation that the opinion of the majority rests. However, the entire third count of the petition, and that part of the first count which refers to the meaning and effect of the letters in regard to the $25,000 block of bonds, must go out of the case on well-settled principles of pleading. The supposed cause of action on this item rests on a false assumption.

Counsel for plaintiffs in their brief assert that all the allegations of the petition must be taken as true in determining its sufficiency. In this, counsel are mistaken. The admission by a demurrer is only of matters that are well pleaded. (*Stewart v. Balderston*, 10 Kan. 131.) Under our statute G. S. 1935, 60-750, neither presumptions of law nor matters of which judicial notice is taken need be stated in a pleading. Such matters, if alleged, would not be well pleaded (*Ellis v. Reddin*, 12 Kan. 306), and obviously would not be admitted by the demurrer. If such allegations are correct they will be recognized by the court, and are therefore superfluous; but if erroneous, the demurrant cannot by an admission make them true. Matters well pleaded, then, are matters of fact which are material to the controversy and are stated in accordance with the rules of pleading. A demurrer admits issuable facts, but does not admit

naked conclusions of the pleader. (*Kretchmar v. City of Atchison,* 133 Kan. 198, 299 P. 2d 621.) If the matters set forth do not produce the legal effect alleged, the pleader's assertion that they do is not admitted by a demurrer. (Clark on Code Pleading, 352; 49 C. J. 434-442; Keigwin, Cases in Common Law Pleading, 2d ed. 432.)

Where a pleading sets out a written instrument such as a letter, contract, bond or other document and alleges that the writing has a certain sense or effect, a demurrer to the pleading admits the existence of the writing, but does not admit that it has the meaning or the legal effect ascribed to it by the pleader, these being matters of law to be determined by the court upon construction of the language employed in the instrument.

Thus in *Dillon v. Barnard,* 21 Wall. 430, 22 L. Ed. 673, the court said:

"The averments of the bill as to the purport and meaning of the provisions of the indenture, the object of their insertion in the instrument, and the obligations they imposed upon the corporation and the trustees, and the rights they conferred upon the plaintiff when his contract was approved, are not admitted by the demurrer. These are matters of legal inference, conclusions of law upon the construction of the indenture, and are open to contention, a copy of the instrument itself being annexed to the bill and, therefore, before the court for inspection. A demurrer only admits facts well pleaded; it does not admit matters of inference and argument, however clearly stated; it does not admit, for example, the accuracy of an alleged construction of an instrument, when the instrument itself is set forth in the bill, or a copy is annexed, against a construction required by its terms; nor the correctness of the ascription of a purpose to the parties when not justified by the language used. The several averments of the plaintiff in the bill as to his understanding of his rights, and of the liabilities and duties of others under the contract, can, therefore, exert no influence upon the mind of the court in the disposition of the demurrer." (p. 437.)

*St. Louis, etc., Railroad v. U. S.,* 267 U. S. 346, 45 S. Ct. 245; 69 L. Ed. 649; *United States v. Ames,* 99 U. S. 35, 25 L. Ed. 295, 300. The legal effect of the letters is that which their language imports. *Interstate Land Co. v. Maxwell Land Co.,* 139 U. S. 569, 11 S. Ct. 656, 35 L. Ed. 278, 282.

In *Rettiger v. Dannelly,* 91 Kan. 61, 136 Pac. 942, it appeared that Dannelly contracted with a church to construct a building for the church and that he and a surety company executed a surety bond running to the church. The plaintiff, Rettiger, supplied stone to Dannelly which he put into the building, and for which he did not

pay. The petition stated Dannelly's contract with the church and set forth the bond *in haec verba*. The petition then averred that the bond had been executed for the benefit and protection of the church and also of all persons who shall furnish materials for the projected building, alleging that the tenor and the legal and equitable effect of the instrument was that if Dannelly and the church should fail to pay for materials furnished, then the surety company would do so. The court said that the alleged legal effect of the instrument was not deducible from the bond, but was inconsistent therewith. The court said:

"This portion of the petition, therefore, pleaded in connection with the contract or bond is not to be taken as true on the hearing of a demurrer to the petition. Where a written contract is unambiguous in its terms, its interpretation or construction is a matter of law for the court. (*Warren v. Thompson*, 35 Kan. 27, 10 Pac. 110.)" (p. 63.)

The third count and part of the first count contain elaborate allegations as to the meaning and legal effect of the letters quoted. The charge is that these letters show the defendant bank was acting as trustee and agent for the plaintiffs; that by reason of these letters a fiduciary relationship was created between the defendant bank and the plaintiffs, and that therefore the defendant bank owed a duty to the plaintiffs to make disclosures to the plaintiffs. Applying the principles of law announced in the foregoing case, it is clearly the duty of the court to set its own interpretation upon these two letters. The demurrer does not admit the construction of the legal effect of the letters set out in the plaintiffs' petition, especially where motions to strike and to make definite and certain have been filed and over-ruled. The letters appear to be ordinary business letters, notifying the plaintiffs that Ronald Finney had deposited certain bonds with the defendant bank to secure Finney's account with the plaintiffs, and asking the plaintiffs to indicate what disposition should be made of the bonds.

When Finney deposited the block of bonds with the defendant bank to be held subject to the direction of the plaintiffs it did not make the defendant bank the agent of the plaintiffs (2 C. J. S. 1027; Restatement, Agency, §§ 15, 26), neither did it operate to transfer the legal title to the bonds to the defendant bank as trustee to be held in trust for the plaintiffs. (1 Bogert on Trusts and Trustees, 24.) It was clearly a bailment, and there was no fiduciary relationship between the defendant bank and the plaintiffs. (Restatement, Trusts, § 5.)

For the reasons stated, the petition fails to state a cause of action as to the $25,000 block of bonds.

As the foregoing analysis covers the first and third counts of the petition, the second and fourth counts must now be examined.

In plaintiffs' brief it is stated: "Count second sets forth the very same transactions described in count first, and the allegations . . . are in all respects identical, except às follows:" It then recites that where the first count charged that the Finneys were engaged in trafficking in *forged* bonds, the second count charged they were trafficking in *purported* bonds. It is further stated: "The only material difference between count first and count second is that the latter does not allege that when the defendant sold and delivered the forged bonds to the Finneys, they intended and planned, to the defendant's knowledge, to obtain money on the supposed security of said forged bonds from innocent persons for value."

If the purpose of this count was to state the same cause of action as alleged in the first cause of action in a different form to meet different possible phases of the evidence (*Hutton v. Oil Co.*, 108 Kan. 197, 194 Pac. 925), it would be subject to the same infirmities as the first count. While it may be proper to state a single cause as several counts to meet the exigencies of proof (1 C. J. S. 1202), our practice does not admit of a mere duplication of the same cause of action in separate counts. It is clear that upon the statement of counsel it does not state a separate cause of action, and the demurrer was properly sustained as to this count.

The fourth count of the petition charges a conspiracy as a separate tort. It alleges that the defendant bank, together with Ronald Finney, Warren W. Finney and one Thomas B. Boyd, who was treasurer of the state of Kansas, "entered into a conspiracy, each with everyone and all the others, to utter, deliver, transfer and negotiate forged, spurious and counterfeit bonds," etc. The other alleged conspirators are not joined as defendants.

Counsel for plaintiffs in their brief state:

"It is submitted that count four sufficiently sets forth a fraudulent conspiracy, and that the allegations sufficiently show the formation and execution of such conspiracy."

If the purpose of the pleader was to state a cause of action for conspiracy as a separate tort, the demurrer was properly sustained, for the reason that in this state a conspiracy is neither a crime (*State v. Robinson,* 124 Kan. 245, 259 Pac. 691) nor a tort. (*Rizer*

*v. Geary County,* 58 Kan. 114, 48 Pac. 568; *Hutson v. Imperial Royalties Co.,* 135 Kan. 718, 13 P. 2d 298; *Federal Reserve Life Ins. Co. v. Gregory,* 132 Kan. 129, 132, 294 P. 2d 859.)

In Burdick's Law of Torts, 4th ed., 474, it is said:

"There has been much discussion of the controverted question whether a conspiracy is a separate tort. Some of the judicial opinions answer this question in the negative. Conspiracy, according to the authors of these opinions, is never the *gravamen* of the action. They declare that unless the acts, which the conspirators combined to do, would be tortious if done by one of them, they do not become tortious by reason of the conspiracy; that damage to the plaintiff is the gist of the action."

In *Bohn Mfg. Co. v. Hollis,* 54 Minn. 223, 55 N. W. 119, 21 L. R. A. 337, 40 Am. Rep. 319, the court said:

"The gist of a private action for the wrongful act of many is not the combination or conspiracy, but the damage done or threatened to the plaintiff by the acts of the defendants. If the act be unlawful, the combination of many to commit it may aggravate the injury, but cannot change the character of the act." (p. 234.)

In *Rizer v. Geary County,* 58 Kan. 114, 48 Pac. 568, the first paragraph of the syllabus reads:

"Wrongful acts or omissions in pursuance of a fraudulent conspiracy, and not the conspiracy itself, constitute a cause of action; and the statute of limitations begins to run from the time of such acts or omissions, if then known to the injured party, and not from the time of his discovery of such conspiracy."

If a conspiracy as a separate tort means that harm results from the concerted action of two or more persons, and the harm is such as could not have been inflicted by any of the parties acting singly, there is no such action known to the law of this state. While it is a common practice in actions of fraud for the pleader to allege that the joint tort-feasors combined and conspired to do certain things, such allegations are well understood merely to be statements in aggravation of the injury. Therefore, if the fourth count undertakes to state a cause of action for conspiracy as a separate and substantive tort, the demurrer was properly sustained as to this count; if not, it was a repetition of the first count. On either theory it fails to state a cause of action.

The petition fails to state a cause of action for the additional reasons:

1. Plaintiffs claim that the fraudulent representations were embodied in the forged bonds, and that when the bonds were trans-

ferred by the defendant bank to Finney, the bank became liable to subsequent transferees. This will be examined.

The Restatement of Torts, section 608, and Comment, reads as follows:

"One who embodies a fraudulent misrepresentation in an article of commerce, a muniment of title, a negotiable instrument or similar document is subject to liability to another who in the course of a business transaction deals with him or a third person in reliance upon the truth of the representation.

*"Comment:*

"*a.* The rule stated in this section may be expressed by saying that such a misrepresentation is made to all persons who may in the ordinary course of business have occasion to deal in a business transaction with such articles, muniments of title or negotiable instruments or with documents purporting to be so.

"*b.* The situations to which the rule stated in this section are usually applicable are where certificates are issued for shares which the corporation is not authorized to issue, where the names of the makers or endorsers of negotiable instruments are forged or the amounts payable thereunder are altered, where false recitals are inserted in deeds or bonds and where merchandise is placed upon the market in containers with misleading labels or in a form which misrepresents its basic character. Such misrepresentations differ materially from misrepresentations of value or quality of an article bought or sold or of other advantages of the bargain in that they are in substance representations of the identity of the thing in question, which is bought and sold on the faith of the honesty of the description. Thus, a deed to land or other muniment of title is not merely a means by which the title is conveyed to the purchaser, it is a description and identification of the title which is conveyed by it. A negotiable instrument identifies not only the amount payable by the persons who are primarily and secondarily obligated to make the payment but also the persons who are so obligated."

Thus the rule announced by the Restatement is that where a person forges the name of the maker or the endorser of a negotiable instrument, such misrepresentation is made to all persons who may in the ordinary course of business have occasion to deal in a business transaction with such forged and spurious paper. There is no charge in the petition that the defendant bank forged the municipal bonds in question. On the contrary, it is alleged in the petition that the defendant bank "was exerting every possible effort to cause the removal of all commercial paper, securities and bonds which said Ronald Finney and Warren W. Finney had placed in said bank." Therefore, the doctrine announced by the Restatement above quoted and in the cases relied upon by plaintiffs has no application to the facts in the case at bar. It was the person who forged the bonds and placed them in the channels of commerce that certified to the truth of the representations embodied in the bond.

Plaintiffs' cause of action, if any, was against Finney, who forged the bonds; not against the defendant bank that received the bonds in good faith and in the usual course of business. The defendant is not to be charged with wisdom born after the event. When suspicion was aroused it had the right to demand the return of its money, and upon payment to redeliver the bonds. Neither was the defendant bank under a duty to shout its suspicions from the housetop, or to hazard a damage suit by instigating a prosecution upon suspicion and without proof against a customer who theretofore had enjoyed credit at defendant's bank. The allegation in the petition that Ronald Finney had long been under suspicion as a rogue by the defendant bank is flatly contradicted by the admitted fact that the defendant bank had loaned him during the time stated large sums of money. Allegations that are manifestly untrue and which are contrary to admitted facts are not admitted by a demurrer.

2. The original petition seems to have been drawn on the theory of negligent misrepresentations. In the amended petition plaintiffs struck from the petition, wherever the same appeared, the phrase "or had reason to believe or by the exercise of ordinary care should have known, and had it exercised ordinary care would have ascertained." The purpose of the amendment seems to have been to abandon the theory of negligence and to state a cause of action for deceit. The effort was not successful. The petition still contains lengthy allegations of negligence, and these allegations are so interwoven with the charges of deceit that it is impossible to determine upon what theory the action is brought. If the action is one for negligent misrepresentations the principles of the law of negligence control the action and it would be a good defense upon the part of the defendants to show that the plaintiffs suffered their loss by reason of their contributory negligence. (Harper on Torts, § 222.) The tort of deceit is for an intentional wrong, and is separate and distinct from a tort action sounding in negligence. (*Reno v. Bull,* 226 N. Y. 546, 124 N. E. 144.) It therefore appears that the petition was not drawn on a definite theory, and it seems impossible to determine whether a recovery is sought for negligent representations or for fraudulent misrepresentations. As the petition was seasonably attacked by motion it would seem that the demurrer was properly sustained. (*Sluss v. Brown-Crummer Inv. Co.,* 137 Kan. 847, 22 P. 2d 965.)

3. The allegations of fraud and deceit are of the most general character, and are insufficient to state a cause of action under the

settled rule in this state. In the early case of *L. L. & G. Rld. Co. v. Comm'rs of Douglas Co.*, 18 Kan. 169, it was contended that intent to defraud was a pleadable fact and should be pleaded as a fact. The court repudiated that contention, and held the specific facts upon which the charge of fraud and deceit was based should be alleged. This rule has been consistently adhered to by a long line of cases, especially where there has been a motion to make definite and certain. (*K. P. & W. Rld. Co. v. Quinn*, 45 Kan. 477, 25 Pac. 1068; *State, ex rel., v. Williams*, 39 Kan. 517, 18 Pac. 727; *Ladd v. Nystol*, 63 Kan. 23, 64 Pac. 985; *Dowell v. Railway Co.*, 83 Kan. 562, 112 Pac. 136; *Federal Reserve Life Ins. Co. v. Gregory*, 132 Kan. 129, 294 P. 2d 859.)

In *Stephens & Condit Transportation Co. v. Central Railroad Co.*, 33 N. J. L. 229, in an action for deceit, the court said: "The rules of pleading clearly require a statement of facts which show to a reasonable certainty that the party sued has done something rendering him liable to the action. Neither adjectives nor adverbs, no matter how numerous or sonorous, can fill the place of such substantial statements."

4. A study of the petition discloses that any money advanced to Ronald Finney by the plaintiffs was upon their own independent investigation, and not upon any representations made by the defendant bank. It is not claimed plaintiffs ever made any inquiry of the defendant as to the credit or character of Finney. The defendant bank never, by written or spoken word or by conduct, so far as the petition shows, represented to the plaintiffs that Finney was worthy of credit.

The petition shows that on July 7, 1933, the plaintiffs had advanced to Finney $121,761.48, and had up to that time received from Finney, bonds of the face value of $30,000, only. Aside from the two letters quoted in the majority opinion there was no communication of any kind, verbal or written, between the plaintiffs and the defendant bank. The letters merely advised the plaintiffs that Finney had deposited certain bonds with the defendant, subject to the plaintiffs' orders. These letters cannot be tortured into representations as to the character, credit or standing of Finney. Since the plaintiffs acted on their own independent investigations, they have stated no cause of action (Restatement, Torts, § 623), and the demurrer was properly sustained.

5. Before recovery can be had in a common-law action for de-

ceit, justifiable reliance upon the misrepresentations must be alleged and proved.

In *Mabardy v. McHugh*, 202 Mass. 148, 88 N. E. 894, 23 L. R. A., n. s., 487, 132 Am. St. Rep. 484, 16 Ann. Cas. 500, the court said:

"People must use their own faculties for their protection and information, and cannot assume that the law will relieve them from the natural effects of their heedlessness, or take better care of their interests than they themselves do. Thrift, foresight, and self-reliance would be undermined if it were the policy of the law to attempt to afford relief for mere want of sagacity. It is an ancient and widely, if not universally, accepted principle of the law of deceit that where representations are made respecting a subject as to which the complaining party has at hand reasonably available means for ascertaining the truth and the matter is open to inspection, if, without being fraudulently diverted therefrom, he does not take advantage of this opportunity, he cannot be heard to impeach the transaction on the ground of the falsehoods of the other party. *(Salem India Rubber Co. v. Adams,* 23 Pick. 256-265; *Slaughter v. Garson,* 13 Wall. 379, 383, 20 L. Ed. 628; *Long v. Warren,* 68 N. Y. 426-432; *Bailey v. Merrell,* 3 Bulstr. 94.) This rule, in its general statement, applies to such a case as that before us. It is easy for one disappointed in the fruits of a trade to imagine, and perhaps persuade himself, that the cause of his loss is the deceit of the other party, rather than his own want of judgment."

The rule is thus stated in *Comment a* under section 617 of the Restatement of Torts:

"While the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity had he shown his distrust of the maker's honesty by investigating its truth, he is nonetheless required to use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory inspection of the article. On the other hand, the rule stated in this section applies only where the recipient of the misrepresentation is capable of appreciating its falsity by the use of his senses. Thus, a defect which any horseman would at once recognize at a first glance may not be patent to a person who has had no experience with horses."

The petition states the plaintiffs are stockbrokers with principal offices in New York City and having branch offices in other cities. Plaintiffs were therefore skilled in the buying and selling of municipal bonds. It is common knowledge that investors buying municipal bonds require a transcript of the proceedings and the opinion of counsel as to the regularity of the issuance of the bonds. It does not appear that the plaintiff required a transcript of the proceedings upon which the bonds received by the plaintiffs from the Finneys were issued or that any inquiry was made of the state auditor as to the registration of the bonds.

It appears from the petition that among the bonds received by plaintiffs on July 7, 1933, was a bond identical in description with a bond plaintiffs received from Ronald Finney on May 29, 1933— that on and after July 7, 1933, plaintiffs advanced to Finney $265,000. Confessedly, the plaintiffs were experts in the bond business. Under such circumstances it can hardly be said that there was justifiable reliance upon the alleged misrepresentations.

From the language of the petition it is shown that the account between the plaintiffs and Ronald Finney covered a period of ninety days, from April 27 to July 27, 1933, and embraced a total of twenty-three items, four blocks of bonds delivered by Ronald Finney to the plaintiffs, and nineteen items of funds advanced to Finney. The amended petition covers forty-nine pages. Our statute provides that the petition shall contain a statement of facts constituting the cause of action, in ordinary and concise language and without repetition (G. S. 1935, 60-704), and that if redundant and irrelevant matter be inserted it should be stricken out. (G. S. 1935, 60-741.) The petition is an unusual performance. A simple situation is made exceedingly complex. Instead of a concise statement without repetition, we have a verbose statement full of repetitions. As a pleading under our code of procedure it would seem there is grave doubt if error was not committed by the trial court in overruling the motions to strike and to make definite and certain. (Nelson v. Schippel, 143 Kan. 546, 56 P. 2d 469.)

It appears that plaintiffs are before us on two untenable propositions: first, that whatever is boldly asserted, plausibly pleaded and vehemently repeated constitutes a cause of action; second, all matters so alleged are admitted by the demurrer. Neither theory will hold water. For the reasons stated, I think the petition fails to state a cause of action.

Wedell, J., not sitting.